**[J-55-2017]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 3 EAP 2017 |
| | : | |
| Appellee | : | Appeal from the Judgement of Superior |
| | : | Court entered on 04/27/2016 at No. |
| | : | 1729 EDA 2014 (reargument denied |
| v. | : | 06/09/2016) affirming the Judgement of |
| | : | Sentence entered on 01/17/2014 in the |
| | : | Court of Common Pleas, Philadelphia |
| I. DEAN FULTON, | : | County, Criminal Division at No. CP-51- |
| | : | CR-0012441-2010 |
| Appellant | : | |
| | : | ARGUED: September 12, 2017 |


**OPINION**


**JUSTICE DONOHUE**                    **DECIDED: February 21, 2018**

In this discretionary appeal, we consider the permissible scope of a warrantless search of a cell phone by police and the confines of the harmless error doctrine. Specifically, we must determine whether powering on a cell phone to gather evidence, without a warrant, violates the Fourth Amendment to the United States Constitution[1] and Article I, Section 8 of the Pennsylvania Constitution,[2] and, if so, whether the

---

[1] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

[2] "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize (continued…)

decision to allow the Commonwealth to present evidence obtained as a result of the warrantless search was harmless beyond a reasonable doubt. For the reasons that follow, we hold that accessing any information from a cell phone without a warrant contravenes the United States Supreme Court's decision in *Riley v. California* and *United States v. Wurie*, 134 S. Ct. 2473 (2014) (hereinafter, "*Riley/Wurie*").[3] We further conclude that the error of admitting the evidence obtained as a result of the warrantless search of the cell phone in this case was not harmless. *See Commonwealth v. Story*, 383 A.2d 155 (Pa. 1978). We therefore reverse the decision of the Superior Court and remand the matter to the Philadelphia County Court of Common Pleas for further proceedings consistent with this Opinion.

## I. Facts

In the early morning hours of June 15, 2010, Michael Toll called 9-1-1 and reported that he had been shot. Police responded, locating Toll in a vehicle on the sidewalk between a legally parked car and a house at 56th Street and Florence Avenue in Philadelphia. Toll informed police that "Jeff" had reached in through the passenger-side window of Toll's vehicle, shot him and then fled on foot in an unknown direction. The shooting occurred in the 5400 block of Florence Avenue. Toll described Jeff as a slim black male wearing white shorts and a white t-shirt. Toll had multiple close-range

---

(…continued)
any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant." Pa. Const. art. I, § 8.

[3] Because of the manner by which we decide this case, we need not address Fulton's claim under Article I, Section 8.

gunshot wounds on the right side of his body. He was taken to the hospital for treatment.

Police photographed and searched Toll's vehicle. There was a wadded twenty dollar bill on the floor between the driver's seat and the doorframe and a personal organizer containing a calendar, money and other papers located on the front passenger seat. Police recovered two fired cartridge casings — one Winchester brand and one Corbon brand — from the floor of the car, and a latent palm print from the roof on the passenger side of the vehicle.

The cell phone in Toll's hand when police arrived at the scene was also recovered from the vehicle. The call log in Toll's cell phone revealed that in the hour preceding the shooting, Toll exchanged several brief calls with an individual listed as "Jeff" with a phone number ending in 7343 (hereinafter, the "Target Number").[4] Police attempted to discern the person associated with that number, but discovered it was linked to a prepaid phone with no subscriber information. Also within the hour before the shooting, Toll placed a lengthier call to an individual referred to in the call log as "Red" with the phone number ending in 8932. Police learned that this phone number belonged to a woman named Rosetta Woods.

Toll ultimately succumbed to his injuries on June 17, 2010. That same morning, police received a call concerning drug activity and a man with a gun behind 6032 Lindbergh Boulevard in Philadelphia. Police responded and found several individuals in and around a 2002 green Mercury Marquis. After observing a gun, holster and cell

---

[4] The phone numbers involved in this case are not reproduced in this Opinion because we do not know whether the phone numbers are still in use.

phones in the vehicle, police took four individuals into custody: Randolph Bell, Anthony Byrd, Eric Adams, and I. Dean Fulton. Fulton had been sitting inside the vehicle. Police seized a smartphone[5] from Fulton's person at the time of his arrest. Police subsequently obtained a search warrant for the vehicle as part of the investigation into violations of the Uniform Firearms Act[6] and recovered the firearm, holster, three cell phones and the owner's card for the vehicle, which indicated that the car belonged to Bell. The gun and the holster were placed on property receipts.

The phones were not placed on property receipts, but were transferred to the Homicide Division of the Philadelphia Police on June 18, 2010, along with Bell, Byrd and Adams, as part of what was now a murder investigation regarding Toll's death.[7] Upon receipt of the phones, Detective John Harkins, the lead detective assigned to the case, opened each phone, powered them on and searched each phone's menu to discern its assigned phone number. It was determined that the number for one of the recovered cell phones, a Samsung flip top cell phone,[8] was the Target Number, the

---

[5]  A "smartphone" is "a cell phone with a broad range of other functions based on advanced computing capability, large storage capacity, and Internet connectivity." *Riley/Wurie*, 134 S. Ct. at 2480.

[6]  18 Pa.C.S. §§ 6101-6127.

[7]  Fulton, who was fifteen years old at the time, was not brought to Homicide because, according to Detective Harkins, "juveniles are restricted from being removed." N.T., 8/21/2013 (motion), at 44-45. Instead, Fulton was transported to the Youth Study Center following his processing at Southwest Detectives.

[8]  A flip-top cell phone, also commonly known as a "flip phone," is a hinged cell phone that folds closed to hide the screen and keypad when it is not in use and "generally has a smaller range of features than a smart phone." *Riley/Wurie*, 134 S. Ct. at 2481.

same number that was assigned to "Jeff" in Toll's cell phone. Detective Harkins did not secure a warrant prior to accessing the information from the seized cell phones.

Detective Harkins left the Samsung flip phone powered on and monitored the phone's incoming calls and texts by viewing either its internal or external display screen.[9] The following day, Detective Harkins answered a call on that cell phone, identifying himself as a member of the police department investigating a homicide. At the detective's request, the caller, Heather Warrington, agreed to meet with him in a convenience store parking lot in Folsom. When Warrington did not arrive at the appointed time, Detective Harkins used the flip phone to call her, and she said she was on her way there. During her interview, she identified the owner of the phone number in question as "Lil Jeff" and told the detective that she purchased heroin from him on a regular basis. Detective Harkins showed her a picture of Fulton, whom she identified by writing "Jeff" on the photograph. Commonwealth's Exhibit C-38. She confirmed that she regularly purchased heroin from Lil Jeff and Bell (who she also identified in a photograph as "J.R."), meeting them either at 54th and Beaumont or at a house at 55th and Beaumont. *Id.*

Adams and Byrd were also interviewed by police. The transcription of the interview reflects that Byrd referred to Fulton as "Red Fox." Adams called him "Red." They each identified Fulton in a photograph using their respective nicknames for him and told police that Fulton had confessed to shooting someone. According to the

---

[9] Detective Harkins' testimony was unclear as to whether he viewed the flip phone's incoming calls and text messages on its internal or external viewing screen. *See* N.T., 8/21/2013, at 48. Based on our decision in this matter, however, the distinction is immaterial.

written version of Byrd's interview, Fulton reported he was sitting in the passenger seat of a vehicle executing a heroin sale to a "fiend at 54th & Beaumont" when the shooting occurred. Commonwealth's Exhibit C-41. The buyer would not let Fulton out of the car, and because he was afraid he was going to be robbed, Fulton shot the buyer. *Id.* Byrd said that Fulton told him about this shortly before their arrest on June 17, and indicated that the shooting had happened "the other night." *Id.* Byrd did not have a cell phone number for Fulton.

As reflected in the transcribed version of Adams' interview, he also told police that Fulton said he was sitting in the passenger seat of a vehicle executing a heroin sale to a "fiend" at the time of the shooting. Commonwealth's Exhibit C-42. According to Adams, however, Fulton said he shot the buyer because he began reaching down next to the driver's seat and Fulton was concerned he "was about to pull something out." *Id.* Adams told police that Fulton stated he climbed out of the car through the passenger-side window because the door would not open after he shot the buyer. *Id.* Adams did not provide police with a time, date or address where the shooting was alleged to have occurred. The transcribed statement indicated that Adams had a number stored in his cell phone under "RedMan," which corresponded to the number saved in Toll's phone as "Jeff." *Id.*

On June 20, 2010, police requested and executed a warrant to search a residence located at 5513 Beaumont Avenue where Bell lived with another individual, Sidi Cameras, and where Fulton "sometimes" slept. N.T., 8/26/2013, at 10-12. Cameras occupied the back bedroom of the house, Bell occupied the front bedroom, and when he was there, Fulton occupied the middle bedroom. Police recovered, in

relevant part, a box of Corbon-brand nine-millimeter ammunition from Bell's bedroom. These bullets were the same brand and caliber as one of the fired cartridge casings recovered from Toll's vehicle.

Police arrested Cameras and interviewed him the following day. He explained to police the layout of the house and identified Fulton in a photograph as "Fox." *Id.* at 16.

Police submitted the latent palm print recovered from Toll's vehicle for evaluation and comparison. The palm print did not belong to either Fulton or Toll, nor did it match any palm prints contained in the police database. *Id.* at 179-80, 182. No other comparisons were conducted.

## II. Procedural History

On October 19, 2010, the Commonwealth charged Fulton with murder, possessing an instrument of crime, and several violations of the Uniform Firearms Act.[10] He filed a counseled suppression motion challenging the lawfulness of the seizure of his flip phone from Bell's vehicle and the permissibility of the search of the phone without a warrant.[11] The trial court denied both motions. Regarding the search of the cell phone,[12] the trial court reached the following legal conclusions:

---

[10] 18 Pa.C.S. §§ 2502, 905(a). The particular violations of the Uniform Firearms Act alleged were possession of a firearm without a license, carrying a firearm on the public street in Philadelphia, and possession of a firearm by a minor. 18 Pa.C.S. §§ 6106(a)(1), 6108, 6110.1(c). All of the firearms violations were nolle prossed.

[11] Notably, on August 8, 2013, the Commonwealth filed a motion before the trial court seeking permission to access "call logs [and] contact information[] in order to determine if any of [the phones recovered from Bell's vehicle] are in fact the phone assigned the [target] number [], the number that had 6 contacts with the victim's phone within the hour prior to his death, the same number that was identified as belonging to 'Jeff' by an independent witness [Warrington]." Commonwealth Application to Search Contents of Cell Phones in Constructive Possession of Defendant, 8/8/2013, at 4. The prosecutor (continued…)

> [P]owering up of the cell phones to determine what cell phone number had been assigned to each phone by the carrier did not require a search warrant as this inquiry represented a **minimally invasive search**. No further efforts were made to recover information from the subject phones at that time[, and Fulton] had no reasonable expectation of privacy in incoming phone calls received on the subject phone. Therefore, his rights were not violated when the detective answered the incoming phone call.

N.T., 8/21/2013 (trial), at 5 (emphasis added). The trial court further explained its reasoning for denying suppression in its Pa.R.A.P. 1925(a) opinion. Relying on *Smith v. Maryland*, 442 U.S. 735 (1979) (holding that no warrant was required to use a pen register at a phone company to identify phone numbers dialed by a particular caller),[13] and *United States v. Flores-Lopez*, 670 F.3d 803 (7th Cir. 2012) (holding that the warrantless search of a cell phone to identify its phone number is a valid search incident to arrest), the trial court found that the warrantless search in question was permissible because the search was limited to obtaining the assigned number to the phone. Trial Court Opinion, 12/30/2014, at 8. According to the trial court, "There was no intrusion into [Fulton]'s personal life, nor any investigation of personal information accessible

---

(…continued)
candidly admitted that he filed the motion without knowing that police had already searched the flip phone without a warrant and obtained the information sought. *See* N.T., 8/20/2013, at 22-25.

[12] The trial court's denial of suppression based on the lawfulness of the seizure of the cell phones was not challenged in Fulton's petition for allowance of appeal before this Court, and we therefore did not grant review of this issue. As such, we do not discuss this aspect of the trial court's decision further.

[13] *But see Commonwealth v. Melilli*, 555 A.2d 1254, 1258 (Pa. 1989) (rejecting the holding of *Smith* based on the greater protections of individual privacy provided under Article I, Section 8 of the Pennsylvania Constitution, and instead holding that "a pen register cannot be utilized by law enforcement authorities without an order based on probable cause").

through the phone." *Id.* at 9. The trial court also concluded that the warrantless acquisition of Fulton's cell phone number "had no impact on the overall investigation of the case, because Philadelphia Police already knew about the interaction between [Fulton]'s cell phone and the decedent from Michael Toll's cell phone call log." *Id.* at 9. Regarding the discovery of Warrington, the trial court found that Fulton "had no reasonable expectation of privacy in the incoming calls to his phone … and did not rise to the level of a search." *Id.*

Warrington's trial testimony was, in relevant part, consistent with the interview she gave to police.[14] She identified Fulton as "Lil Jeff" and confirmed that the phone number she used to contact him was the Target Number. N.T., 8/21/2013 (trial), at 51, 58. Warrington estimated that she called that number 1000 times to make arrangements to purchase heroin from either Fulton or Bell, both of whom used that phone number, meeting them on either 54th or 56th Street in Philadelphia on a daily basis over a six-month period. *Id.* at 52-53, 60-61. On cross-examination, Warrington acknowledged that she knew Fulton as "Lil Jeff," and never referred to him simply as "Jeff." *Id.* at 84-85. When asked why, then, she labeled the photograph of Fulton with the name "Jeff," and not "Lil Jeff," Warrington stated, "I didn't put it because I wanted to get the hell out of [the detective's] car." *Id.* at 85-86.

Cameras also testified at trial and his testimony was consistent with the interview he gave to police regarding the makeup of the house at 5513 Beaumont Avenue. *See*

---

[14] Warrington revealed that she lied to police about how long it had been since she had seen Fulton prior to her interview. During her interview she said she had not seen him since she went to rehab on May 27, 2010. Commonwealth's Exhibit C-38. At trial she admitted that she had seen him approximately a week prior to her police interview. N.T., 8/21/2013 (trial), at 63-63.

N.T., 8/26/2013, at 10-13. He confirmed that Fulton, who he knew as "Fox," never occupied the front room when he slept there, and that Fulton was not living there at the time Cameras spoke to police. *Id.* at 12-13, 22-24.

Byrd and Adams, however, recanted their statements entirely. They denied that they knew anything about Toll's murder, that they implicated Fulton as the perpetrator of a shooting or that they referred to Fulton by any nicknames in their conversations with police. Adams further denied that he had Fulton's cell phone number saved in his phone's contacts. Although Adams admitted to signing the interview transcribed by police, he stated that he only did so because police threatened that he would go to jail if he did not sign the statement and that he was under the influence of marijuana and Xanax at the time of his interview. Byrd denied that the signatures appearing on the transcribed version of his interview and its accompanying photographs were his and further denied that he answered any of the questions posed to him by police about the shooting.

Following a week-long trial, a jury convicted Fulton of third-degree murder and possessing an instrument of crime. On January 17, 2014, the court sentenced Fulton to fifteen to thirty years of incarceration. Fulton filed a timely appeal to the Superior Court, raising seven claims for its review. Of relevance to the issues presented before this Court, Fulton challenged the trial court's decision to deny suppression of the fruits of the warrantless search of his flip phone, asserting that the phone's number and information obtained from Warrington should have been suppressed. Relying on *Riley/Wurie*, Fulton argued that the search violated his rights under both the United States and Pennsylvania Constitutions.

In an unpublished memorandum decision authored by former Judge Fitzgerald, the Superior Court agreed that police had searched the flip phone, but found that "the extent of the specific intrusion complained of was **minimal**" compared to the facts of *Riley/Wurie* (discussed below) and the Superior Court's earlier decision interpreting *Riley*, *Commonwealth v. Stem*, 96 A.3d 407 (Pa. Super. 2014).[15] *Commonwealth v. Fulton*, 1729 EDA 2014, *19 (Pa. Super. April 27, 2016) (unpublished memorandum) (emphasis added).

> The detective powered up the phone and although he "searched" the phone's data for the number associated with it, he accessed no additional information or data on the phone. In contrast to *Wurie*, the discovery of Warrington's existence was not the product of a search of the call logs or other information contained on the phone. Rather, the detective answered the phone, which had been on his desk.

*Id.*

Although not raised by the Commonwealth, the Superior Court alternatively held that even if the warrantless search of Fulton's flip phone was unlawful, and that all of the fruits of the search, including Warrington's testimony, should have been suppressed, any error by the trial court in permitting the admission of the tainted evidence was harmless. It based its conclusion on its assessment of the evidence presented at trial, in particular:

> [Fulton] did not deny ownership of the phone identified as [the Target Number], and that number was listed in [Toll]'s phone under "Jeff." In a dying declaration, [Toll] identified "Jeff" as his assailant. Additionally, two witnesses submitted statements detailing [Fulton]'s confession to a shooting that

---

[15] In *Stem*, the Superior Court applied the holding in *Riley/Wurie* to affirm the suppression of photographs accessed by police on the defendant's cell phone without a warrant. *Stem*, 96 A.3d at 414.

was substantially similar to that described by [Toll]. Both witnesses identified [Fulton] by his picture.

*Id.* The Superior Court thus concluded that "in light of the other properly admitted evidence … the admission of Warrington's testimony was harmless and not a basis for reversal." *Id.* at *19-20.

Fulton filed a timely petition for allowance of appeal, which this Court granted to review two claims:

> a. The Superior Court's opinion is contrary to *Riley/Wurie*[,] which held that the warrantless search of a flip top cell phone is prohibited without any expectation for minimal intrusion.
>
> b. The Superior Court's opinion is contrary to this Court's opinion[s] in *Story* and [*Commonwealth v. LaRosa*, 626 A.2d 103 (Pa. 1993),] which held that a constitutional error cannot be harmless unless there is independent evidence that is untainted, uncontradicted and overwhelming.

*Commonwealth v. Fulton*, 165 A.3d 888 (Pa. 2017) (per curiam).

### III. Discussion

### A. The Search of Fulton's Cell Phone

### 1. *Riley/Wurie*

In 2014, the United States Supreme Court granted certiorari in two cases involving the warrantless search of a cell phone – one involving a smartphone and one involving a flip phone – to determine "whether the police may, without a warrant, search digital information on a cell phone seized from an individual who has been arrested." *Riley/Wurie*, 134 S. Ct. at 2480. In *Riley*, police arrested the defendant for possessing concealed, loaded firearms. Police seized a smartphone from the defendant incident to his arrest and accessed the phone without a warrant. Observing notations in his

contact list that signified gang involvement, the arresting officer turned the phone over to a detective specializing in gangs, who further examined the contents of the phone. The videos and photographs observed on the phone resulted in Riley being charged in connection with an earlier shooting, for which he was ultimately convicted and given an enhanced sentence because the crimes were committed for the benefit of a gang.

In *Wurie*, police seized a flip phone from the defendant incident to his arrest for drug delivery. The phone, which was already powered on, received repeated calls from a number identified in the phone as "my house" on the phone's external viewing screen. *Id.* at 2481. Without first obtaining a warrant, police opened the phone and observed that the wallpaper of the phone was a photograph of a woman and a baby. Police then accessed the phone's call log with the press of a button, and pressed another to discern the phone number assigned to "my house." *Id.* Police then used the phone number to search a web-based phone directory to identify the address associated with that number. The police went to that address and observed a woman through the window who resembled the woman in the photograph on the wallpaper of Wurie's phone. The police then obtained and executed a warrant to search the residence, which resulted in the discovery and seizure of a large amount of drugs, paraphernalia, a firearm, ammunition and money.

The United States Supreme Court held that although the warrantless seizure of the cell phones from Riley and Wurie was permissible as the result of a search incident to arrest, the subsequent searches of their phones was not. Instead, the Court held that to lawfully search a cell phone, police must first obtain a warrant. *Id.* at 2485, 2493. The Court explained that although cell phones contain information that is, in substance,

the same as physical items that are permissibly searched incident to an individual's arrest pursuant to Fourth Amendment jurisprudence (e.g., an address book, a wallet or a purse), the quantity and quality of data that can be stored on cell phones place them in an entirely different class for purposes of a search. *Id.* at 2488 ("That is like saying a ride on horseback is materially indistinguishable from a flight to the moon. Both are ways of getting from point A to point B, but little else justifies lumping them together.") The *Riley/Wurie* Court reasoned that the privacy concerns related to the search of a cell phone far exceed any such concerns related to the search of these other physical items, as cell phones "place vast quantities of personal information literally in the hands of individuals," all in one place. *Id.* at 2485, 2489 (referring to the name "cell phones" as a "misleading shorthand," as they "could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers"). The variety of information that can be stored, the details about a person's life that the information can convey, and the length of time the information can remain catalogued in a cell phone, which are carried by the great majority of people, led the Court to conclude that data stored on a cell phone is entirely distinguishable from any physical evidence counterpart. *Id.* at 2489-90.

Notably, the high Court rejected the government's reliance on *Smith* and *Flores-Lopez*, the very cases upon which the trial court in the case at bar relied to explain its authorization of the warrantless search of Fulton's phone. The *Riley/Wurie* Court explained that unlike the use of a pen register (which the Court in *Smith* held was not a search and thus did not require a warrant), accessing the call logs on a cell phone was unquestionably a search – one that yields not only phone numbers, but whatever other

identifying information the cell phone owner attaches to that number (e.g., names, nicknames, photographs, addresses, etc.). *Id.* at 2492-93.

Further, the Court disagreed with the government's argument that the search of a cell phone for information that police could have obtained from a pre-digital counterpart was permitted without a warrant. *Id.* at 2493. The *Riley/Wurie* Court noted the holding of *Flores-Lopez* as stating, "[i]f police are entitled to open a pocket diary to copy the owner's address, they should be entitled to turn on a cell phone to learn its number," *id.* (citing *Flores-Lopez*, 670 F.3d at 807), but found that decision to be in error:

> [T]he fact that a search in the pre-digital era could have turned up a photograph or two in a wallet does not justify a search of thousands of photos in a digital gallery. The fact that someone could have tucked a paper bank statement in a pocket does not justify a search of every bank statement from the last five years. And to make matters worse, such an analogue test would allow law enforcement to search a range of items contained on a phone, even though people would be unlikely to carry such a variety of information in physical form. In Riley's case, for example, it is implausible that he would have strolled around with video tapes, photo albums, and an address book all crammed into his pockets. But because each of those items has a pre-digital analogue, police under California's proposal would be able to search a phone for all of those items – a significant diminution of privacy.

*Id.*

Concerned that "an analogue test would launch courts on a difficult line-drawing expedition to determine which digital files are comparable to physical records," the Court precluded a case-by-case approach to determining whether the search of a cell phone required a warrant. *Id.* Instead, the Court held that in all cases, "even when a cell phone is seized incident to arrest," the search of a cell phone requires a warrant. *Id.* In short, the high Court summarized its holding with a simple rule: when police want

to search a cell phone, "get a warrant." *Id.* at 2495. The Court was unanimous on this point. In the lone minority opinion authored in the case, Justice Alito stated, "The Court strikes [the balance between law enforcement and privacy interests] in favor of privacy interests with respect to **all cell phones and all information found in them**," and agreed that there is no "workable alternative" to this blanket holding. *Id.* at 2467 (Alito, J., concurring) (emphasis added).

## 2. The Search

Fulton argues that pursuant to *Riley/Wurie*, police were not permitted to access the flip phone at all without a warrant and that the act of opening and turning on his phone constituted a search. Fulton's Brief at 19. The Commonwealth, attempting to distinguish this case from *Riley/Wurie*, counters that no search of the phone occurred because police navigated the menus of the phone only to obtain the phone's assigned number, which is "public information" in which Fulton had no expectation of privacy.[16]

---

[16] Instead of constituting a search, the Commonwealth asserts, without explication or discussion, that police powered on and obtained the flip phone's assigned number as part of the "police caretaking function." Commonwealth's Brief at 16 n.2. The Commonwealth suggests, through citation *Colorado v. Bertine*, 479 U.S. 367, 372 (1987) (addressing the lawfulness of an inventory search of a vehicle), that Detective Harkins powered on the cell phone to "secure and protect" the phone. Commonwealth's Brief at 16 n.2. The Commonwealth fails to cite any evidence of record that would support this finding.

It further fails to discuss the community caretaking doctrine at all or how it would be applicable under the circumstances of this case. In particular, the Commonwealth makes no attempt to reconcile the requirement that a caretaking inventory search must be conducted pursuant to a standard police procedure with the absence of any testimony that any such procedure existed, let alone that the search was conducted pursuant thereto. *See Bertine*, 479 U.S. at 372-74; *Commonwealth v. Lagenella*, 83 A.3d 94, 103 (Pa. 2013). Indeed, the record reflects that the police in the case at bar did not follow another established procedure as they failed to place the seized phones on a property receipt. N.T., 8/21/2013 (motion), at 57 (Detective Harkins testifying, that (continued…)

Commonwealth's Brief at 16-28. Emphasizing the factual differences between the case at bar and *Riley/Wurie*, the Commonwealth argues that the type of information accessed here "did not come close to violating the central concern in *Riley/Wurie*: that cell phone data that could be used to discern '[t]he sum of an individual's private life,' be protected." *Id.* at 28-29 (quoting *Riley/Wurie*, 134 S. Ct. at 2489).[17]

When reviewing a ruling on a motion to suppress, this Court is bound by the factual findings made by the suppression court that are supported by the record but review its legal conclusions de novo. *Commonwealth v. Cooley*, 118 A.3d 370, 373 (Pa. 2015). Our scope of review is limited to the record developed at the suppression hearing, considering the evidence presented by the Commonwealth as the prevailing party and any uncontradicted evidence presented by Fulton. *Commonwealth v. Johnson*, 160 A.3d 127, 138, 139 n.12 (Pa. 2017), *cert. denied sub nom. Johnson v. Pennsylvania*, __ U.S. __, 2017 WL 4285216 (U.S. Dec. 4, 2017).

---

(…continued)
"[d]epartmental policy indicates that property taken into custody should be properly receipted," and that this procedure was not followed for the seized cell phones). As this contention is undeveloped and entirely untethered to both the facts and the law, it warrants no further consideration.

[17] The Commonwealth also contends Fulton failed to establish that he had a privacy interest in the Samsung flip phone because the phone was unmarked, unlocked and seized from Bell's vehicle, and that he lacked standing to bring his motion to suppress. Commonwealth's Brief at 12-15. Neither argument was ever raised at the hearing on Fulton's suppression motion. *See generally* N.T., 8/21/2013 (motion), at 81-93 (Commonwealth's argument at the suppression hearing). In fact, the Commonwealth court not have advanced either argument before the trial court because its case against Fulton hinged upon him being "Jeff," the owner of the Samsung flip phone. As such, the Commonwealth is estopped from now raising the argument that Fulton lacked a possessory interest in the Samsung flip phone or standing to challenge its seizure and subsequent search. *See In re S.A.J.*, 838 A.2d 616, 620 (Pa. 2003) ("As a general rule, a party to an action is estopped from assuming a position inconsistent with his or her assertion in a previous action, if his or her contention was successfully maintained.").

*Riley/Wurie* does not support the decisions of the lower courts (nor the Commonwealth's arguments in support thereof). *Riley/Wurie* could not be clearer: in order to access any information on a cell phone, police must first obtain a warrant.[18] The high Court created no exception for what police or courts may deem a "minimally invasive" search, as the trial court in the case at bar found, or a "minimal intrusion," as found by the Superior Court. As the above discussion of the case reveals, the United States Supreme Court expressly rejected a case-by-case approach to determining whether a warrant was required prior to accessing certain information contained in a cell phone, opting instead to adopt a categorical rule prohibiting police from looking for any information on a cell phone without a warrant.

The *Riley/Wurie* Court held that in the absence of an applicable exception, **any search** of a cell phone requires a warrant. This is because, like one's home, an individual's expectation of privacy is in the cell phone itself, not in each and every piece of information stored therein. Consequently, a warrant is generally required for law enforcement to search a cell phone. *See Riley/Wurie*, 134 S. Ct. at 2491 ("[A] cell phone search would typically expose to the government far **more** than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form – unless the phone is [in the house].") (emphasis original).

---

[18] The *Riley/Wurie* Court left open the possibility that "case-specific exceptions" (e.g., consent or exigent circumstances) could justify the search of a particular cell phone. *Riley/Wurie*, 134 S. Ct. at 2494.

A search occurs when police intrude upon a constitutionally protected area without the individual's explicit or implicit permission. *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (*citing United States v. Jones*, 565 U.S. 400, 406 n.3 (2012)); *Commonwealth v. Shabezz*, 166 A.3d 278, 288 (Pa. 2017). To constitute such an intrusion, the action need not uncover something "of great personal value"; even a small, seemingly insignificant act of information gathering by police in a constitutionally protected area is a search. *See Arizona v. Hicks*, 480 U.S. 321, 325 (1987). In *Hicks*, for example, the high Court held that the act by police of moving stereo equipment to view its serial number was a search under the Fourth Amendment: "A search is a search, even if it happens to disclose nothing but the bottom of a turntable." *Id.* Any actions taken unrelated to an otherwise authorized intrusion that result in exposing "concealed portions" of an area in which a person has a protected privacy interest is, for constitutional purposes, a search. *Id.*

Our review of the record in this case reveals that Detective Harkins conducted three distinct searches of Fulton's cell phone without a warrant. The first occurred when the detective powered on the phone. The record reflects that Fulton's flip phone was one of three phones recovered by detectives investigating a separate crime unrelated to Toll's murder. N.T., 8/21/2013 (motion), at 30, 45. The phones were transferred to the homicide detectives investigating Toll's murder because the phones were believed to have possible evidentiary value based on Toll's call log, which indicated that he communicated several times with "Jeff" at the Target Number within a short period of time prior to the shooting. *Id.* at 26, 46-47. Fulton's flip phone was off when it was

received by Detective Harkins. Therefore, in order to discern the assigned number of the phone, Detective Harkins powered on the phone. *Id.* at 47.

The act of powering on Fulton's flip phone constituted a search, i.e., an intrusion upon a constitutionally protected area (Fulton's cell phone) without Fulton's explicit or implicit permission. *See Jardines*, 569 U.S. at 6. Turning on the phone exposed to view portions of the phone that were previously concealed and not otherwise authorized by a warrant or an exception to the warrant requirement. *See Hicks*, 480 U.S. at 325. Powering on the phone is akin to opening the door to a home. It permitted police to obtain and review a host of information on the cell phone, including viewing its wallpaper, reviewing incoming text messages and calls, and accessing all of the data contained in the phone.

Detective Harkins engaged in a second warrantless search when he obtained the phone's assigned number. After powering on the phone, Detective Harkins navigated through the menus of the flip phone to obtain its number. N.T., 8/21/2013 (motion), at 47. By virtue of this search, Detective Harkins learned that the number assigned to Fulton's flip phone was the same number labeled as "Jeff" in Toll's phone. *Id.* at 47-48. As stated above, the *Riley/Wurie* Court rejected the *Flores-Lopez* decision and its conclusion that accessing a cell phone to obtain its phone number was permissible without a warrant. *See Riley/Wurie*, 134 S. Ct. at 2493. The act of navigating the menus of a cell phone to obtain the phone's number is unquestionably a search that required a warrant.

Detective Harkins conducted a third warrantless search of the phone when he monitored incoming calls and text messages. To aid in his investigation of Toll's

murder, he kept the phone powered on, monitoring the calls and text messages that came through by viewing the number and/or assigned name of the individual calling or texting on the flip phone's internal or external display. N.T., 8/21/2013 (motion), at 48. The day after the phone was delivered to homicide, Detective Harkins reviewed "a number of calls and texts that were incoming during the course [of time] that the phone was in the homicide unit," and then answered a phone call from Warrington. *Id.* As stated by Detective Harkins at the suppression hearing, his decision to answer Warrington's phone call "wasn't by chance"; his testimony reflects that he made an informed decision, through his review of the calls and texts coming in, to take her call. *Id.* at 48, 58.

Contrary to the finding of the trial court and the argument advanced by the Commonwealth before this Court, there is little difference between monitoring the internal and external viewing screens on a cell phone and searching the phone's call logs. Both result in accessing "more than just phone numbers," but also "any identifying information that an individual might add" to his or her contacts, including the caller's photograph, the name assigned to the caller or sender of the text message. *See Riley/Wurie*, 134 S. Ct. at 2492-93. Further, and unlike a call log, monitoring a phone's incoming text messages allows the viewer to see the content of a text message, which indisputably constitutes private data. This is all information that, pursuant to *Riley/Wurie*, cannot be accessed by police without a warrant.

The rule created by *Riley/Wurie* is exceedingly simple: if a member of law enforcement wishes to obtain information from a cell phone, get a warrant. The failure

to do so here violated Fulton's rights under the Fourth Amendment to the United States Constitution.

### 3. Fruits of the Poisonous Tree

It remains, then, for this Court to determine what evidence, if any, must be suppressed as a result of the unlawful warrantless searches of the flip phone. Fulton argues that all of the information obtained must be suppressed as fruits of the poisonous tree, including: the phone's telephone number; the existence of Warrington; and Warrington's statement to police and her trial testimony. Fulton's Brief at 20 (citing *Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963)). Conversely, the Commonwealth argues (assuming there was a search) that the only search that occurred was the navigation of the phone's menus to discern the flip phone's assigned number. Commonwealth's Brief at 29-31. Regarding Warrington's communication with police and her eventual identification of Fulton as "Jeff" with the Target Number, the Commonwealth asserts that it was attenuated from the search because obtaining the assigned number to the flip phone "did not cause Ms. Warrington to call it or to agree to testify at trial," and her decision to testify was voluntary and "not in any manner caused by police conduct." *Id.* at 31, 32.

Evidence of any kind obtained by police through an unlawful search may not be used in any respect, including as evidence at trial against the subject of the search. *Wong Sun*, 371 U.S. at 484-85; *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920). Such evidence may only be used against the defendant "[i]f knowledge of [the evidence] is gained from an independent source," *Silverthorne Lumber Co.*, 251 U.S. at 392, or "the evidence in question would inevitably have been

discovered without reference to the police error or misconduct," *Nix v. Williams*, 467 U.S. 431, 448 (1984). The burden of proof is on the prosecution to establish by a preponderance of the evidence that the evidence illegally obtained would have ultimately or inevitably been discovered by legal means. *Id.* at 444.

"The exclusionary remedy for illegal searches and seizures extends not only to the direct product of the illegality, the primary evidence, but also to the indirect product of the search or seizure, the secondary or derivative evidence." *Tainted evidence subject to exclusion – Secondary or derivative evidence: Fruit of poisonous tree, Searches and Seizures, Arrests and Confessions* § 3:4 (2d ed.). The test to determine whether derivative evidence constitutes the fruit of an illegal search is not simply whether police would not have discovered the information but for the search, as derivative evidence may nonetheless be usable and admissible if the connection between the information obtained was sufficiently attenuated from the illegal search, thus removing the taint of the original illegality. *Wong Sun*, 371 U.S. at 487-88; *United States v. Crews*, 445 U.S. 463, 471 (1980). To determine whether evidence must be excluded as the fruit of an unlawful search, courts must consider "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality." *Wong Sun*, 371 U.S. at 488 (quoting Maguire, Evidence of Guilt, 221 (1959)); *Shabezz*, 166 A.3d at 289 ("The inquiry simply is whether the evidence was obtained via exploitation of the initial illegality."); *see also Nix*, 467 U.S. at 443 ("the prosecution is not to be put in a better position than it would have been in if no illegality had transpired" but "the derivative evidence analysis ensures that the prosecution is not put in a worse position simply because of some earlier police

error or misconduct"). "In applying this test, a court must evaluate whether the illegal search or any leads gained from the search tended to significantly direct the government toward discovery of the specific evidence being challenged." *Searches and Seizures, Arrests and Confessions* § 3:4.

In the case at bar, evidence that the assigned number to Fulton's flip phone was the Target Number was primary evidence, obtained directly from the illegal warrantless search of the phone. There is nothing in the record that supports a conclusion that police had an independent source to identify the phone number of that particular phone (i.e., no witness identified the Samsung flip phone as being the phone with that assigned number) or that the discovery of the assigned number to that phone was inevitable.

The existence of Warrington was likewise primary evidence that Detective Harkins obtained from his illegal search of Fulton's cell phone. There is no evidence of record that Detective Harkins had any knowledge of Warrington's existence or of her relationship with Fulton outside of his conversation with her on Fulton's flip phone. There was no testimony presented to support a finding that her discovery was inevitable or that police would have otherwise learned of her existence from a source independent of the illegal search. Warrington was not a witness to the crime in question, but rather was calling Fulton to purchase heroin. Detective Harkins learned of her existence solely as a result of his illegal searches, i.e., powering on the flip phone, monitoring its incoming calls and answering Warrington's call.

The discovery of Warrington through the illegal searches of the phone led to Detective Harkins arranging to interview Warrington and ultimately to her connecting

Fulton to the number assigned to "Jeff" in Toll's phone and identifying Fulton as "Lil Jeff" both in her interview with police and at trial. *See* N.T., 8/21/2013 (motion), at 57-58; N.T., 8/21/2013 (trial), at 51, 58. This evidence was derivative of the initial unlawful searches (i.e., powering on the phone and monitoring its incoming calls). Whether to exclude her testimony and the information she provided to police in her interview requires additional considerations, as the United States Supreme Court has cautioned that courts must not "mechanically equate[]" live witness testimony with "inanimate evidentiary objects illegally seized." *U.S. v. Ceccolini*, 435 U.S. 268, 277 (1978). In addition to the question of whether the connection between the challenged evidence and the illegal search was sufficiently attenuated to remove the taint from the testimonial evidence, courts must consider two additional factors before excluding live testimony as a fruit of the unlawful search. The first factor is the witness' willingness to testify. According to the *Ceccolini* Court,

> The greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness. Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition.

*Id.* at 276-77 (footnote omitted). The Court noted, however, that analysis of this factor differs "where the search was conducted by the police for the specific purpose of discovering potential witnesses." *Id.* at 277 n.4.

The second factor is the extent to which the witness can offer testimony about material and relevant facts that are wholly unrelated to the illegal search. *Id.* at 277.

"[S]ince the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and that kind of testimony is required." *Id.* at 278.

With respect to the first factor, the suppression record in the case at bar does not establish that Warrington was a likely volunteer to willingly testify. As stated above, Warrington, who was a heroin addict at the time, did not contact police on her own accord, thinking instead that she was contacting Fulton to purchase heroin. N.T., 8/21/2013 (motion), at 48-50. There is no reason to believe that she would have come forward to speak to police about Fulton on her own volition. Although she agreed to meet Detective Harkins when he asked for her cooperation, she would not give him her home address. *Id.* at 49. Instead, she agreed to meet the detective in a convenience store parking lot, she arrived more than a half an hour late for the interview, and came only after Detective Harkins called her (using Fulton's flip phone) to ensure she would appear. *Id.* at 49-50.

Moreover, the circumstances surrounding the warrantless searches of Fulton's cell phone strongly suggest that this is a case where police conducted the illegal search for the purpose of discovering potential witnesses. *See Ceccolini*, 435 U.S. at 277 n.4. Detective Harkins monitored the calls and texts received on Fulton's flip phone for more than a day before deciding to answer Warrington's call, and his decision to answer the call from Warrington "wasn't by chance." N.T., 8/21/2013 (motion), at 48, 58. Upon answering the phone, he immediately identified himself as a detective investigating a murder and asked for her cooperation. *Id.* at 49. Thus, even if Warrington was a willing witness, this factor would not carry significant weight in favor of allowing her testimony at trial.

Turning to the second factor, the suppression record reflects that Warrington did not provide police with relevant information that was unrelated to the illegal search. She was not a witness to the crime and did not have any information about the events at the scene of the murder. The purpose of the illegal warrantless searches of the phone was to determine whether the Samsung flip phone was the same phone assigned to "Jeff" in Toll's cell phone and to identify the owner of the phone. Warrington's only value as a witness was connecting Fulton to the phone number in question and to the name "Jeff." *See* Commonwealth's Exhibit C-38.

The record also reflects no attenuation between the powering on and monitoring of the phone calls and the statement Warrington gave to police. As a matter of timing, the events happened on the same day, June 19, 2010, and there was no intervening event that would "break the chain flowing directly from" the illegal searches that resulted in the interview given to police by Warrington. *See Shabezz*, 166 A.3d at 290 (observing that the brief lapse of time between the illegal seizure and the subsequent search left "no viable argument that the search was sufficiently attenuated from the seizure so as to purge the taint of the initial illegality").

The illegal warrantless searches of the flip phone did not just lead the government to obtain the statement and testimony from Warrington, it was the only basis for her discovery. *See Searches and Seizures, Arrests and Confessions* § 3:4. Here, "the witness' identity was discovered or her cooperation secured only as a result of an unlawful search." *See Crews*, 445 U.S. at 471-72. We therefore conclude that Detective Harkins obtained Warrington's statement and her testimony at trial by his

exploitation of the original illegal searches. *See Wong Sun*, 371 U.S. at 488; *Shabezz*, 166 A.3d at 289.

Based on our evaluation of the evidence obtained as a result of the illegal searches of Fulton's flip phone, we agree with Fulton that all of this evidence should have been suppressed. This includes the number assigned to the flip phone, the existence of Heather Warrington, and all aspects of her statement to police and trial testimony, including her identification of Fulton's number as the Target Number and her identification of him as "Lil Jeff" or "Jeff."

## B. Harmless Error

In his second issue, Fulton asserts that the Superior Court's alternative conclusion – that even if the evidence obtained as a result of Detective Harkins' illegal search of the phone was subject to suppression, the failure to do so was harmless – is contrary to the harmless error doctrine announced by this Court in *Story* and reiterated in *LaRosa*. Fulton's Brief at 21-23.[19]

*Story* constitutes the first decision from this Court to set forth a clear definition of both the standard of proof for determining whether an error is harmless and the definition of harmlessness. *Story*, 383 A.2d at 162 (noting that prior decisions "have not articulated a consistent standard for determining whether error is harmless"). In *Story*, we adopted the standard of proof for harmlessness announced by the United States Supreme Court for federal constitutional errors in *Chapman v. California*, 386 U.S. 18 (1967): "an error can be harmless only if the appellate court is convinced beyond a

---

[19] Fulton did not raise a claim, and does not argue now, that the Superior Court erred by finding harmless error sua sponte. We therefore do not consider this unsettled question here.

reasonable doubt that the error is harmless." *Story*, 383 A.2d at 162; *see also LaRosa*, 626 A.2d at 107-08.  The Commonwealth bears the burden of proving that the error was harmless beyond a reasonable doubt.  *Story*, 383 A.2d at 162 n.9.

In support of the beyond-a-reasonable-doubt standard, the *Story* Court observed that it is "commensurate with the standard of proof in criminal trials that an accused cannot be convicted unless the trier of fact is convinced beyond a reasonable doubt that the accused is guilty as charged," noting "the danger that a lenient harmless error rule may denigrate the interests and policies which both constitutional and non-constitutional rules promote."  *Id.* (citing *In re Winship*, 397 U.S. 358 (1970)).  Further, the Court found "sound reasons for applying the same standard for determining harmless error whether the error violates state or federal law."  *Id.* at 163.  "State rules often implicate constitutional values, and the violation of a state rule may rise to the level of a federal constitutional violation," and "a more relaxed harmless error standard for errors perceived as violations of state rules, but which might also be violations of the federal Constitution, would leave constitutional values inadequately protected."  *Id.*

In defining the standard for harmlessness, the *Story* Court held, "[A]n error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict.  Whenever there is a 'reasonable possibility' that an error 'might have contributed to the conviction,' the error is not harmless."  *Id.* at 164 (quoting *Commonwealth v. Davis*, 305 A.2d 715, 719 (Pa. 1973); *Chapman*, 386 U.S. at 24).

The Court set forth the circumstances in which an error can in fact be deemed harmless based on the holdings of numerous of our prior cases.  *See Story*, 383 A.2d at

164-67. This lengthy discussion has been abbreviated and repeatedly articulated in subsequent cases as follows:

> Harmless error exists if the state proves either: (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted **and uncontradicted** evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*See, e.g., Commonwealth v. Burno*, 154 A.3d 764, 787 (Pa. 2017) (quoting *Commonwealth v. Simmons*, 662 A.2d 621, 633 (Pa. 1995)) (emphasis added; italicization omitted).

It was the third scenario of harmlessness that was at issue in *Story* and found to be applicable in the case at bar by the Superior Court. As explained by this Court in *Story*, "The requirement that the 'overwhelming' evidence relied upon be uncontradicted follows from the principle that an error cannot be harmless if 'honest, fair minded jurors might very well have brought in not guilty verdicts.'" *Story*, 383 A.2d at 167 (quoting *Davis*, 305 A.2d at 721; *Chapman*, 386 U.S. at 18). This conclusion is premised on the long understood limitation of an appellate court: "[a]n appellate court is ill equipped to resolve conflicts in the evidence or make findings of fact." *Id.* at 168.

> We recognize that a guilty verdict indicates that conflicts in the evidence were resolved in favor of the Commonwealth. However, the jury may have relied on the tainted evidence, while unsure of the verity of the untainted evidence. Similarly, the corroboration provided by the tainted evidence may have led the jury to accept the untainted evidence. Unless the evidence claimed to be overwhelming is uncontradicted we cannot conclude, beyond a reasonable doubt, that a jury would have resolved the conflicts in the same manner absent the improperly admitted evidence.

> Thus, we hold that, in applying the overwhelming evidence test to determine if an error is harmless, a court may rely only on uncontradicted evidence. The uncontradicted evidence of guilt must be so overwhelming, and the prejudicial effect of the improperly admitted evidence so insignificant by comparison, that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict.

*Id.*; *see also LaRosa*, 626 A.2d at 108. Applying this standard to the facts before it, the *Story* Court concluded that because the evidence of the defendant's guilt was disputed, the erroneous admission of other, irrelevant evidence could not be harmless.[20] *Story*, 383 A.2d at 168-69.

In the case before us, the Superior Court found that the trial court's admission of the evidence obtained as a result of the illegal search of Fulton's phone (including the cell phone's number and Warrington's testimony) was harmless "in light of the other, properly admitted evidence … and not a basis for reversal." *Fulton*, 1729 EDA 2014, at **19-20. It based this conclusion on the interviews given by Byrd and Adams wherein they told police that Fulton confessed to a "substantially similar" shooting; Fulton's failure to deny that he owned the cell phone with the Target Number as its assigned number; that number was assigned to "Jeff" in Toll's cell phone; and Toll told police that he was shot by Jeff. *Id.* at *19.

At the outset, we observe that the Superior Court failed entirely to discuss whether the evidence that it relied on to find harmless error was contradicted by other

---

[20] The erroneously admitted evidence at issue in *Story* was testimony from the widow of the murder victim regarding "her husband's family status and personal life" and details about a photograph of the victim with his child. *Story*, 383 A.2d at 159. This Court found that "this evidence injected extraneous considerations into the case and prejudiced appellant by creating sympathy for the victim and his family." *Id.*

evidence of record. This omission from its determination of harmlessness is fatal to its conclusion. As our discussion of *Story* makes clear, overwhelming evidence of a defendant's guilt is **never** harmless unless that evidence is uncontradicted. *See Story*, 383 A.2d at 167-69.

This is particularly problematic because the statements by Byrd and Adams, relied upon by the Superior Court in its harmless error analysis, were not uncontradicted evidence of Fulton's guilt. In fact, Byrd and Adams themselves contradicted these statements by disclaiming at trial that they provided police with any of the relevant and pertinent information contained therein. The transcribed interviews were therefore admitted into evidence as prior inconsistent statements. *See Commonwealth v. Lively*, 610 A.2d 7, 10 (Pa. 1992); Pa.R.E. 803.1(1).

The written interviews recounting Fulton's confession to Byrd and Adams were also contradicted by Toll's description to police as to how the shooting occurred and the physical appearance of the car after the shooting. Byrd and Adams placed Fulton inside the vehicle when he allegedly shot Toll; Toll reported that Jeff shot him from outside of the vehicle, through the passenger-side window, and photographs of the vehicle showed a personal organizer occupying a portion of the front passenger seat where Fulton was allegedly sitting. *Compare* Commonwealth's Exhibits C-41 & 42 *with* N.T., 8/21/2013 (trial), at 94 and Commonwealth's Exhibit C-9. The details of the written interviews with Byrd and Adams also did not align with each other, as each provided a different explanation as to why Fulton shot the victim. *Compare* Commonwealth's Exhibit C-41 *with* Commonwealth's Exhibit C-42. Further, Byrd and Adams stated that they knew Fulton to go by Red or Red Fox, but the name "Red" was

assigned to a number in Toll's cell phone belonging to Rosetta Woods. *Compare* Commonwealth's Exhibits C-41 & 42 *with* N.T., 8/27/2013, at 65-66.

Moreover, the evidence that the assigned number of the Samsung flip phone was the Target Number was, as stated above, the product of the illegal search of the cell phone by police and thus not properly considered by the Superior Court as part of the harmless error analysis. The only evidence presented at trial that was both untainted and uncontradicted was that Toll was shot by a person named Jeff; Toll communicated several times prior to the shooting with an individual identified in his phone as "Jeff" with the Target Number; that phone number was assigned to a prepaid cell phone that had no subscriber information; a latent palm print was recovered from Toll's vehicle that did not belong to Fulton or Toll; and bullets of the same brand and caliber as a shell casing found in Toll's vehicle were recovered from a home where Fulton sometimes slept, but in a bedroom belonging to someone other than Fulton.

In other words, in the absence of the evidence obtained from the illegal searches of Fulton's flip phone, there was no uncontradicted evidence, let alone overwhelming evidence, to support Fulton's guilt for Toll's murder. No one other than Warrington identified Fulton as "Jeff," no uncontradicted testimony identified Fulton as the individual with the phone number assigned to "Jeff" in Toll's cell phone, and there was no physical or forensic evidence to identify Fulton as the shooter.

In its brief filed in this Court, the Commonwealth now contends that any error committed by admitting the evidence of the Samsung flip phone's assigned number was harmless because it was both cumulative of other properly admitted evidence and Fulton was not prejudiced by its admission. Commonwealth's Brief at 33-36. For all of

the aforementioned reasons, we find no merit to these contentions. The only other evidence presented by the Commonwealth connecting Fulton to the number assigned to "Jeff" in Toll's cell phone was Adams' prior inconsistent statement, which he disclaimed in his testimony at trial. *See* N.T., 8/22/2013, at 55-57, 144. Thus, the jury was faced with a question of credibility: whether to believe Adams' testimony or the prior inconsistent statement he allegedly gave to police. Given this, there is certainly a "reasonable possibility" that the evidence confirming that Fulton's flip phone was in fact assigned the number in question caused the jury to credit Adams' prior inconsistent statement over his trial testimony, and as a result, this evidence "might have contributed to the conviction." *Story*, 383 A.2d at 164. Further, as stated hereinabove, Warrington's testimony and interview with police was not properly admitted evidence. It also was not cumulative, as no witness other than Warrington identified Fulton as using the name Jeff – the name of the person who Toll identified as his killer. There is little doubt that this evidence was highly prejudicial and may have contributed to Fulton's conviction. *Id.*

The admission of the evidence obtained from the illegal searches of Fulton's phone – its assigned number, Warrington's testimony and Warrington's police interview – was not harmless beyond a reasonable doubt. We therefore reverse the Superior Court's finding of harmless error.

## IV. Conclusion

The Superior Court erred by finding the warrantless searches of Fulton's flip phone were permissible because they only minimally intruded on his privacy interests, removing this case from the protection provided to cell phones by the United States Supreme Court in *Riley/Wurie.* All evidence obtained from the warrantless searches of

Fulton's flip phone, including the phone's assigned number, the existence of Warrington and all of the information obtained through her meeting with police, were subject to suppression as fruits of the illegal searches. The Superior Court further erred by finding that the admission of the evidence obtained from the illegal searches of Fulton's flip phone was harmless based on its inaccurate statement of the test for harmless error as well as its consideration of tainted evidence in support of its finding of harmlessness.

Judgment of sentence vacated; case remanded to the Court of Common Pleas of Philadelphia County for further proceedings consistent with this Opinion.

Chief Justice Saylor and Justices Baer, Todd, Dougherty and Wecht join the opinion.

Justice Mundy did not participate in the consideration or decision of this case.