626 A.2d 103

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Joseph LaROSA, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 22, 1991.

Decided May 27, 1993.

480

Norris E. Gelman, Philadelphia, for appellant.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Div., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

The facts in this case are that a Philadelphia County Court of Common Pleas jury convicted Appellant, Joseph LaRosa, of murder of the third degree and criminal conspiracy and the co-defendant, Joseph Fareri, of voluntary manslaughter, criminal conspiracy, and possession of an instrument of crime. Appellant has raised six issues on appeal, three of which relate to the crucial introduction of the prior recorded testimony of one Patrick O'Brien, a witness who testified during co-defendant Fareri's preliminary hearing but who was not available to testify at the joint trial of Appellant and Fareri.[1] Appellant

---

1. Appellant's other issues are set forth as follows:

    1) Were the verdicts so inconsistent as between the co-defendants as to establish that the jury did not rule on the evidence, but acted out of

claims that Mr. O'Brien's testimony exculpates the co-defendant and implicates the Appellant; that the probative value of the testimony is outweighed by the unfair prejudice that resulted from its admission; and, that the trial judge's cautionary instruction was not an effective substitute for the Appellant's right of cross-examination in the face of this adverse and prejudicial result. We are hence called upon to address the following issue: whether the Appellant was deprived of his right of confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Pennsylvania Constitution, when the trial judge permitted the prosecutor to introduce the prior recorded testimony of Patrick O'Brien against the co-defendant, Joseph Fareri, after he instructed the jury that the evidence ". . . must be considered only against Mr. Fareri and not against Mr. LaRosa."

The evidence produced at trial includes the following. On August 13, 1987, the victim, James Damiano, was shot in the left side of his chest with a .38 caliber handgun during a confrontation with Appellant and the co-defendant. A police officer, who was patrolling the area in question, stopped his police cruiser after he heard a voice yell, "Officer, Officer . . . I've been shot." (T.T., p. 91). The policeman entered the parking lot and found two white males standing in the parking lot and the victim bending over at his waist and grabbing his side. He helped the victim into his police car, but he did not

prejudice, bias, or some other factor, and did the resulting verdicts violate due process of law because an accomplice cannot be held to a greater crime than that of the actor if both are tried by the same jury?

A) Does the doctrine of collateral estoppel apply to a jury verdict returned against co-defendants where the same facts yield totally different results?

2) Was trial counsel ineffective for failing to properly raise the issues relating to the inconsistent verdicts?

.        .        .        .

3) Was trial counsel ineffective for failing to seek an arrest of judgment as to the conspiracy to murder conviction because once Fareri is found not to have committed murder, Appellant could not have conspired with him so to do, and no other persons were involved?

In view of our disposition of the issues related to the introduction of the O'Brien testimony, we need not address the other issues raised by Appellant.

stop to identify either of the males, nor could he later identify them as the Appellant or the co-defendant.

Nelson DeBona, a friend of both the victim and the Appellant, testified that he was with the victim when the Appellant and the co-defendant pulled up in a pickup truck and asked the victim to meet with them across the street in the parking lot. (T.T., p. 358–59). *He testified that Appellant was seated in the driver's seat and the co-defendant was seated in the passenger's seat.* The victim walked over to the parking lot and the Appellant stepped out of the truck, but the co-defendant remained inside of the vehicle. (T.T., p. 359, 364–65). DeBona remained on the other side of the street, where he listened to their argument until he entered a pizza shop to purchase a Coke. (T.T., p. 365, 368). A very short time later, he walked out of the pizza shop and he heard a loud "crack." (T.T., p. 368). DeBona immediately ran to the parking lot and watched as Appellant helped a policeman carry the victim to the police car. (T.T., p. 370).

After Mr. DeBona testified, the prosecutor moved to introduce the prior recorded testimony of Patrick O'Brien against the co-defendant after he had informed the court that Mr. O'Brien had moved to England and would be unavailable for the foreseeable future. The Appellant objected to the Commonwealth's tactic but his objection was overruled essentially on the grounds that the testimony was merely cumulative.

After the trial judge overruled the objection, he informed the jury that:

> ... this officer [Officer Roy Pettway] is not Patrick O'Brien the so-called witness who testified at a prior proceeding. But he is going to read exactly what Patrick O'Brien said at the prior proceedings. Now, at the prior proceeding, it was only against Mr. Fareri, not against Mr. LaRosa. He was not available at that time, the prior proceeding dealt only with Mr. Fareri. So, whatever you hear must be considered only against Mr. Fareri and not against Mr. LaRosa.

(T.T., p. 666).

The following testimony was then read into evidence:

484

Q. (District Attorney): When you were sitting in your car and waiting to use the phone, did something unusual occur that causes you to come to Court today?

A. (Mr. O'Brien): Yeah, I saw somebody get shot. I heard shooting. I saw somebody get shot.

. . . . .

Q. How far were they from you when you were sitting in your car?

A. I'm not sure. Five, 10 feet.

. . . . . .

Q. The person that got shot, can you tell us where he came from prior to his meeting these other two people?

A. He came from across the street.

Q. Where did the two people come from that did not come from across the street?

A. They pulled in the parking lot where I was sitting.

Q. How did they pull into the parking lot, in what?

A. In a truck.

Q. Did you observe the passenger and the driver of the truck?

A. I noticed them.

Q. How did they exit their truck and what did they do upon exiting their truck? Describe what you observed?

A. I saw them get out of the truck and start talking to the guy that came from across the street.

Q. What did you then see happen by and among the three of them that were talking?

A. When they were arguing, one guy grabbed something from the guy that got shot—excuse me, from the guy that was shot.

. . . . .

Q. The person that grabbed something from the guy that was shot, where in the truck had that person been?

A. I think he was the passenger.

Q. What about the other fellow, what was he doing in the truck before he got out of the truck?

A. He was driving it.

Q. Did you hear any conversation or words?

A. It sounded like they were arguing about a girl.

. . . . .

Q. Did you see a gun?

A. I thought I did.

Q. *In whose hand was the gun, the passenger or the driver.*

A. *The passenger, I think.*

Q. *Do you see the passenger of that truck in this court-room right now? Look carefully around the room. I see you are looking at me for the most part.*

A. *No, I can't identify him.*

Q. *What did the man that did the shooting do after he shot the man in the stomach?*

A. *The man that did the shooting?*

Q. *Yes.*

A. *He walked away.*

Q. *What did the other man do?*

A. *Helped the victim into the police car and got into the truck and left.*

(T.T., p. 669–672) (emphasis added).

The O'Brien transcript, it must be emphasized, contained testimony from Mr. O'Brien that the three men were engaged in an argument over a girl.

Finally, the Commonwealth introduced the victim's dying declaration. A Philadelphia police detective interviewed the victim and identified the assailants as Joey Monk/Appellant and Joey Wrench/co-defendant. (T.T., p. 726). The victim claimed that the argument in the parking lot concerned accusations regarding Appellant's girlfriend, Fran.

Joey Monk (Appellant) said "I should put one in you" and pulled a gun from his waistband.... [And] gave the gun to

Joey Wrench (co-defendant) ... shortly thereafter Joe—Joey Wrench (co-defendant) pointed the gun at [the victim's] stomach and fired it.

(T.T., p. 727). The detective then concluded his narration by stating, "Joey Monk (Appellant) stayed until the police arrived, and then he left." (T.T., p. 731).

█ Review of the testimony understandably reveals that a major dispute erupted when the Commonwealth elected to use Mr. O'Brien's testimony. Mr. O'Brien failed to identify the co-defendant as the passenger or the shooter and this created the biggest controversy because the co-defendant admitted that he was the passenger of the vehicle and that the gun fired (accidentally) while it was in *his*, the co-defendant's hand. (T.T., p. 1058 and 1063–64). Mr. O'Brien's testimony, at best, was inherently confusing. Witness DeBona's testimony identified the co-defendant as the passenger in the truck and this was consistent with the co-defendant's own testimony, as noted, that he himself was the passenger as well as the shooter (although an accidental shooter). The victim's dying declaration also points to the co-defendant as the shooter. The O'Brien testimony casts doubt on all of this because O'Brien did not see, in court, the "passenger" (allegedly, the co-defendant) at the co-defendant's own preliminary hearing. It may have been from inferences drawn from the O'Brien transcript and rejection of the co-defendant's testimony that the jury concluded that Appellant was guilty of third degree murder while the co-defendant was only guilty of voluntary manslaughter. They would have to have rejected the theory that the co-defendant was the shooter and this would only have been justified had they disbelieved the co-defendant and at the same time used O'Brien's testimony against Appellant in spite of the trial court's instruction not to do so. Indeed, the centrality of the O'Brien transcript can be gathered from the fact that after the jury had deliberated for some time, they requested to hear the O'Brien testimony again. The trial judge complied with this request, but refused Appellant's request that he again instruct the jury that the O'Brien testimony could only be considered against Fareri, and not

against Appellant. The trial court then had the O'Brien testimony read back to the deliberating jury, absent the requested limiting or cautionary instruction that this previously recorded testimony could only be considered against the co-defendant and not against Appellant.

The only other possible theory available that explains the jury's conclusion that Appellant was guilty of murder and that the co-defendant was only guilty of manslaughter is that they concluded that Appellant master-minded these tragic events. If that was the case, the O'Brien transcript was not just confusing, it directly contradicted Appellant's defensive strategy. Either way, its admission was not, therefore, harmless error.

■ In Pennsylvania, the proper standard for determining whether a trial error violates the federal Constitution or the state Constitution is that the uncontradicted evidence of guilt must be so overwhelming, and the prejudicial effect of the improperly admitted evidence so insignificant by comparison, that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict. *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978).

> Where a trial error violates the federal constitution, this court, at a minimum, must employ the federal harmless error rule. See *Chapman v. California*, 386 U.S. 18, 21 [87 S.Ct. 824, 826], 17 L.Ed.2d 705 (1967). A federal constitutional standard cannot be found harmless unless an appellate court is convinced beyond a reasonable doubt that the error was harmless. *Id.* Where the trial error arises under state law, however, the proper standard for determining whether such an error is harmless is a question of state law.
>
> ... [W]e hold that the proper standard for determining whether an error involving state law is harmless is the same as the standard this court applies to federal constitutional error: an error can be harmless only if the appellate court is convinced beyond a reasonable doubt that the error is harmless.

We adopt the standard that an error cannot be held harmless unless the court determines that the error could not have contributed to the verdict. Whenever there is a "reasonable possibility" that an error "might have contributed to the conviction," the error is not harmless. *Commonwealth v. Davis*, 452 Pa. [171] at 178, 305 A.2d [715] at 719 [1973], quoting *Chapman v. California*, 386 U.S. at 24, 87 S.Ct. at 828.

We recognize that a guilty verdict indicates that conflicts in the evidence were resolved in favor of the Commonwealth. However, the jury may have relied on the tainted evidence, while unsure of the verity of the untainted evidence. *Unless the evidence claimed to be overwhelming is uncontradicted* we cannot conclude, beyond a reasonable doubt, that a jury would have resolved the conflicts in the same manner absent the improperly admitted evidence. Thus, we hold that, in applying the overwhelming evidence test to determine if an error is harmless, a court may rely only upon uncontradicted evidence. The uncontradicted evidence of guilt must be so overwhelming, and the prejudicial effect of the improperly admitted evidence so insignificant by comparison, that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict.

*Story, supra* (emphasis added).

The Commonwealth asserts that any error here was harmless because it existed within the framework of overwhelming evidence of guilt, and could not have contributed to the verdict.

■ In applying this test, an appellate court must first decide if the trial evidence was contradicted, and, if so, the harmless error approach may not be used to save the conviction on the ground that the evidence was overwhelming. *Story's* holding on this is quite clear. See, *supra.*

As explained above, the O'Brien testimony was either so confusing that it was prejudicial to Appellant or contradicted Appellant's position that the shooting was accidental and that Appellant himself had not masterminded the killing. After all,

the O'Brien notes of testimony severely contradicted the testimony offered by the co-defendant. The co-defendant had testified that the shooting was accidental following a discussion of the sale of two firearms.[2]

When testimonial evidence is used against a defendant (which occurred here as a practical matter in spite of the trial judge's instructions to the jury), that defendant has the constitutional right to confront the testimony against him and cross-examine the witness, unless the testimony, "erroneously" let in, was harmless error, because the O'Brien transcript either confused Appellant's defense without his being given a chance to cross-examine, or directly contradicted Appellant's defense, without his being given a chance to cross-examine. Either way, Appellant was deprived of a fundamental constitutional right. *Commonwealth v. Galloway*, 476 Pa. 332, 382 A.2d 1196 (1978).

The full O'Brien notes of testimony relate the entire incident to an argument over a girl—bolstering the testimony of the Philadelphia Police Detective who related that the deceased had so told him prior to his death. The argument provides motive and eliminates the defense of accident. Either way, as unnecessarily confusing or contradictory, O'Brien's testimony was prejudicial to Appellant without him being given a chance to cross-examine and confront O'Brien.

It is also noteworthy that the prosecutor relied heavily on the O'Brien testimony in his cross-examination of co-defendant Fareri. A sample of his questions reveals the prosecutor making much of the O'Brien testimony against both Appellant and Fareri:

Q. Okay and up to August 13th, 1987, had you ever met a man named Patrick O'Brien? (T.T., p. 1082).

Q. Therefore, you would have no reason to suspect Patrick O'Brien would offer any testimony against you *or Mr. LaRosa*— ... arising out of any personal anger, revenge, motive or bias against you, would you? (T.T., p. 1082, 1083).

2. Appellant never took the stand or testified in his own behalf.

Q. At that time did you hear Mr. O'Brien say that *these three fellows* were right outside his car and they were arguing about a girl? (T.T., 1084).

Q. Don't you remember hearing Mr. O'Brien testify, timidly testifying? (T.T., p. 1084).

Q. Do you remember Mr. O'Brien testifying? (T.T., 1085).

Q. So then your testimony today is in sharp conflict with what Mr. O'Brien said? (T.T., p. 1087).

Indeed, even the trial judge, in his opinion, recognized the importance of the O'Brien testimony to the Commonwealth. He wrote:

Patrick O'Brien was an eyewitness who was unavailable at the time of trial. His testimony from defendant Fareri's Preliminary Hearing was read into the record. He had seen the shooting and overheard the argument that led to the killing and provided facts which denied the defendant's version. (Slip opinion, p. 3). (emphasis added).

With the testimony contradicted—indeed, the prosecutor termed it "in sharp conflict"—the overwhelming evidence rule is inapplicable, and the error arising from the admission of the O'Brien testimony compels reversal since it clearly was not harmless.

Because the O'Brien transcript was confusing, or in the alternative, because it contradicted Appellant's defense evidence, its erroneous admission, to the prejudice of Appellant, is not harmless error. Appellant is entitled to a new trial.

Accordingly, the decision of the Superior Court 400 Pa.Super. 619, 576 A.2d 1135 is reversed and the matter is remanded for a new trial.

McDERMOTT, J., did not participate in the decision of this case.

NIX, C.J., concurs in the result.