J-S50004-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| COURTLAND MITCHELL | : | |
| | : | |
| Appellant | : | No. 1205 WDA 2017 |

Appeal from the Judgment of Sentence June 22, 2017
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0007794-2016

BEFORE: BOWES, J., OTT, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.: FILED FEBRUARY 27, 2019

Courtland Mitchell appeals from the judgment of sentence of six to twelve months of incarceration followed by five years of probation after a jury convicted him of unlawful conduct with a minor, endangering the welfare of children, and corruption of minors. Specifically, Appellant challenges evidentiary rulings of the trial court that allowed admission as substantive evidence out-of-court statements made by S.W., the minor victim. As we conclude the testimony was improperly admitted, we vacate Appellant's judgment of sentence and remand for a new trial.

The trial court offered the following summary of the evidence offered at Appellant's trial.

> S.W., the nine year old victim, testified fully regarding numerous aspects of her daily life. However, when the Commonwealth asked her specifics regarding Appellant, her step-grandfather, S.W.'s demeanor would change and she would become nonresponsive. Th[e trial c]ourt observed that the witness

appeared to be "frozen" on the witness stand, looking downward and failing to answer those questions asked. The most explicit S.W. was in her testimony was when she stated that she told her mother that "he like did bad things to like me and my body."

After her testimony, the Commonwealth moved to admit S.W.'s testimony from the preliminary hearing as a prior inconsistent statement. After brief argument by opposing counsel, th[e trial c]ourt granted the motion and admitted her prior testimony from the preliminary hearing as both an inconsistent and a consistent statement under Commonwealth v. Brady[, 507 A.2d 66 (Pa. 1986),] and Commonwealth v. Hunzer[, 868 A.2d 498 (Pa.Super. 2005)]. The preliminary hearing transcript was read into the record.

. . . .

Dr. Jennifer Wolford from the Children's Hospital of Pittsburgh Child Advocacy Center testified that she conducted a physical exam on S.W. Despite a small amount of hymenal tissue irritation, Dr. Wolford testified that the exam was "entirely normal." She stated that the lack of physical evidence does not rule out that a child has been abused.

Jamie Mesar, also from the Children's Hospital of Pittsburgh Child Advocacy Center[,] testified that she conducted a forensic interview of S.W. on March 23, 2016. Mesar testified that the interview had been recorded. Over the objection of counsel for Appellant, the forensic interview video was played in open court for the jury.

. . . .

S.W.'s mother, testified that she became aware of some inappropriate kissing between her mother-in-law (Appellant's wife) and some of the grandsons. She asked her sons, S.W.'s brothers, if their grandmother kissed them on the lips. One child denied [it] and another said it happened "all the time." [S.W.'s mother] testified that after she asked the boys, S.W. came down the stairs and [she] decided to ask S.W. about her grandmother. [S.W.'s mother] then asked S.W. if her grandmother ever did anything that made her feel uncomfortable. S.W. said that her grandmother once rubbed Vaseline on her and that made her feel uncomfortable. [S,W.'s mother] then asked if Pop-Pop (Appellant)

- 2 -

had ever done anything that made her feel uncomfortable. S.W. paused, started breathing heavily, and then responded with a few "um"s before saying no. [S.W.'s mother] said that S.W. got off her lap and pulled her off of the couch and led her upstairs, away from her brothers, and into [her] bedroom. Once upstairs, [she] asked S.W. again if "Pop-Pop" ever did anything that made her feel uncomfortable. S.W. told her mother that Appellant kisses her and "stick[s] his tongue in my mouth" and that it happens "a lot."

Detective Robert Synowiec testified that he interviewed Appellant on April 6, 2016. Appellant denied the allegations and denied that he was ever alone with S.W.

. . . .

Clarnece Mitchell, Appellant's wife of 35 years, testified that she had never been accused of inappropriately kissing her grandchildren. She testified that in February of 2016, prior to any allegations of Appellant's sexual misconduct with his granddaughter, she and Appellant met with S.W.'s parents at a local restaurant to resolve some differences. The family caused a scene to the extent that she thought the police would be called. She testified that she never observed anything in S.W.'s demeanor or interaction with Appellant that gave her pause or concern.

. . . .

Appellant testified in his own defense, saying that he has never been accused of a crime before and that he was a father figure to his wife's children. He spoke at length regarding the family dynamics, specifically the tension which arose when certain family members failed to call and check on him when his wife was away. Appellant also discussed the failed attempt to work through the family's issues at the restaurant. He denied sexually touching S.W. or putting his tongue in her ear. He admitted that he played "dollies" with S.W. and pretended to go on dates with her, pretended to go to the movies, swimming, and specifically pretended to be her boyfriend. He denied asking S.W. if she kissed on the first date.

Trial Court Opinion, 12/14/17, at 3-6 (citations omitted).

Upon this evidence, a jury convicted Appellant of unlawful conduct with a minor, endangering the welfare of children, and corruption of minors, and acquitted him of involuntary deviate sexual intercourse with a child and indecent assault of a person less than thirteen years of age. Appellant was sentenced as indicated above on June 22, 2017. The trial court denied Appellant's timely-filed post-sentence motion, and Appellant filed a timely notice of appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.[1]

Appellant presents the following question for our review: "Did the trial court err when it permitted the Commonwealth to introduce, at Appellant's jury trial, three pretrial statements made by [S.W.] in this case—specifically, [her] preliminary hearing testimony, her statements during a videotaped forensic interview, and a statement made by her to her mother?" Appellant's brief at 3.

We consider Appellant's issue mindful of the our standard of review:

The admissibility of evidence is a matter addressed solely to the discretion of the trial court, and may be reversed only upon a showing that the court abused its discretion. For there to be abuse of discretion, the sentencing court must have ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

_____

[1] This Court granted a motion to reinstate the appeal after Appellant's brief was filed late despite the grant of three extensions. Disposition of the appeal was further delayed by the absence of the preliminary hearing transcript in the certified record; the transcript was supplemented per this Court's order on December 14, 2018.

- 4 -

Commonwealth v. Johnson, 179 A.3d 1105, 1119-20 (Pa.Super. 2018) (internal citations and quotation marks omitted).

As Appellant's issues relate to the trial court's admission of out-of-court statements as both inconsistent and consistent with the testimony that S.W. gave at Appellant's trial, we begin with a thorough examination of that testimony. S.W. discussed Appellant's conduct as follows, in relevant part.

Q. Was there ever a time that you were around [Appellant] and he touched you in a way you did not like?

A. Yes.

Q. Do you remember any of that ever happening at your house?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. Did anything like that ever happen in your living room?

A. Yeah.

Q. Do you remember one of the times that it happened?

A. Yes.

Q. Can you tell us about that?

A. I sat down. We were watching the movie Frozen, and then I don't really remember like everything that happened, but all I remember is that he told me to sit on his lap and then I don't remember what happened next.

Q. Did you sit on his lap?

A.     Uh-huh.

        . . . .

Q.     Were you facing him or facing away from him?

A.      Away.

Q.     Did he say anything when you sat on his lap?

A.     I don't know.

Q.     Is there anything else about that you can remember?

A.     I remember what I was wearing.

Q.     What were you wearing?

A.     I was wearing a blue sweat suit with a wolf on it like on the shirt, and that's what I was wearing.

Q.     During that time when you were just sitting on his lap, did anything else happen?

A.     I don't remember.

Q.     So you said there was a time that he touched you in a way you didn't like?

A.     Uh-huh.

Q.     When was one of those times?

A.     In my brother['s] room.

        . . . .

Q.     So this time that something happened in your brother's room, what happened?

A.     We were playing a game, but I don't remember what game.

Q.     You and who were playing a game?

A.     Me and [Appellant].

Q.     When you were playing a game, was it a video game or another kind of game?

A.     It happened so long ago.  I kind of don't remember.

Q.     Do you remember anything about it?

A.     Huh-uh.

Q.     Do you remember any occasion where he touched you in a way you didn't like?

A.     I don't really know.

Q.     Is it hard to talk about stuff like this?

A.     Yes.

Q.     What is hard about it?

A.     Just like talking about it.

Q.     So we're in a room with a lot of people.  Do you know any of these people?

A.     No.

Q.     So have you ever talked about stuff like this with this many people before?

A.     Huh-uh.

Q.     Have you ever talked about stuff like this with other people in your family?

A.     Uh-huh.

. . . .

Q.     Do you remember a time where your mom was talking to your brothers about your Grandmommy?

A.    Uh-huh.

      . . . .

Q.    Were you involved in that conversation?

      . . . .

A.    I was upstairs playing with my toys.

      . . . .

Q.    Did you . . . ever talk to your mom about anything like that?

A.    Well, then I came downstairs and my mom wasn't going to ask me, because I think she thought I was too young, but then I just came downstairs and my mom thought it was just like the right time.

      So she asked me about it and then I started feeling nervous because I don't know what [Appellant] would do to me, but then I started thinking of the good things that like my parents will protect me and -- yeah.

Q.    So you were feeling nervous about talking to your mom. What were you feeling nervous about?

A.    Because I don't know what they were going to do to me because I didn't know that it was not my fault.

Q.    When you say "it was not your fault," what are we talking about?

A.    That like what he did.

Q.    Who is "he"?

A.    [Appellant].

Q.    Did he do something to another person?

A.    Uh-huh.

Q.    Who was that?

- 8 -

A.    Me.

Q.    Do you remember one of those things that he did?

A.    Like do you mean at a place or something?

Q.    You said that you were nervous about telling your mom about the things he did to you.  We just want to know one of those things.

You can start where ever you want.  Whatever you remember, and if nothing happened at all, you can tell us that to.

A.    Okay.

Q.    Do you want to start with what you told your mom?

A.    Yes.

Q.    What did you tell her?

A.    I told her like everything, because I was thinking about the things that would happen, because if I -- if I told my mom a lie, then it will just feel like that I am turning into a bad person.

So I told her the truth, and so my hands were shaking, because I didn't know what would happen because nobody can tell the future.  So I was just shaking and like wondering what would be happening.  So I told her and --

Q.    [S.W.], what did you tell her?

A.    That -- I told her that [Appellant] -- well, like --

Q.    Did you tell her about [Appellant] ever touching you?

A.    Uh-huh, but I told her that like a couple of days after.

Q.    What part of his body touched you?

A.    Just his hands.

Q.   Did his lips ever touch you?

A.   Uh-huh.

Q.   Is that a yes or no?

A.   Yes.

Q.   What part of your body did his lips touch?

A.   Like my arms, and I think like that.

Q.   Did he ever touch any parts of your face with his lips?

A.   Uh-huh.

Q.   What part of your face did his lips touch?

A.   Like my cheeks.

Q.   Did he ever kiss you on the lips?

A.   Uh-huh.

Q.   Did he kiss you on the lips the same way that your parents kiss you on the lips?

A.   No.

Q.   What was different about the way he kissed you?

A.   It was like longer.

Q.   Was his mouth opened or closed when he kissed you longer?

A.   Closed.

Q.   Did he ever touch any other parts of your body with his lips?

A.   Huh-uh.

Q.   Whenever he kissed you on the lips longer, was it in front of other people?

A.    Huh-uh.

       . . . .

Q.    So did you ever talk to your mom about anything [Appellant] did that made you feel uncomfortable?

A.    Uh-huh.

Q.    Can you tell us about one of these?

A.    I told her like everything that happened, and -- yeah.  So that's what I did.

Q.    So I want to know when you say "I told her everything that happened," can you tell me everything that happened and tell these people?

A.    Well, I told them when I was like eight, because the -- well, I told her when I was eight.   So whenever I told her, I told her that he like did bad things to like me and my body.

       After I told my mom, she was like sad and disappointed, but I don't know if she was disappointed that I didn't tell her earlier, but she said it's not my fault, because I was being - - it starts with an O, I think. I don't really remember the word.  I know what the word means and it means to do what an adult says, but I just forget the word.

Q.    That's all right. Now, you said he did things to your body that were bad.  That's what I want to hear about. Can you tell me about one of those times so I understand what happened?

A.    Well, if he would like touch me in a certain way, and so after I told my mom, we started going to these different places.  I went to like a different place and I forget what it's called, but I talked to a lady.  Her name was Jamie.

       She was very, very nice, and I think I saw the Detective there.  I think I did and somebody else, but she was very nice to me.  So we were just talking about what happened

and then I started going to these different places. Like I started going here, but I was kind of sad.

Q.     What did you feel sad about?

A.     And disappointed because I didn't see Jamie, because she was like kind of the first friend that I talked to her about this. That was just first knowing.

Q.     You told her about [Appellant] touching you in a certain way?

A.     Uh-huh.

Q.     What part of his body did he touch you with in that certain way?

A.     My face, my legs, and my arms. And that's all I remember.

Q.     When he touched you, did he touch you over your clothes? Under your clothes? Something else?

A.     It happened so long ago. I don't really remember.

N.T. Trial, 3/1-7/17, at 49-53, 66-70, 74-76 (objections omitted).

During a recess called before Appellant was given the opportunity to cross-examine S.W., the Commonwealth moved to admit S.W.'s testimony at Appellant's preliminary hearing as prior inconsistent statements, contending that Appellant had "a fair and full opportunity to cross examine the witness" at the preliminary hearing. Id. at 76. Appellant objected on the grounds that the Commonwealth was either seeking to impeach its own witness or offer the prior testimony as substantive evidence. Id. at 77. Appellant also contended that the prior testimony was not admissible as a prior consistent statement, as Appellant had not impeached S.W.'s credibility through cross-examination

by implying that the testimony was fabricated. Id. Further, Appellant argued that he did not have a full and fair opportunity to cross-examine S.W. at the preliminary hearing. Id. at 81.

The trial court concluded that S.W.'s trial testimony was both consistent and inconsistent with her preliminary hearing testimony, "because while she states that she doesn't recall when directly asked about many things, then in other light, she does state about telling her mom about the bad things he did to her." Id. at 80. The court decided to allow the testimony to be read, explaining: "This is a situation where I believe the interest of justice would be served by the [j]ury hearing the full information possible." Id. The trial court advised Appellant that if he did not wish to cross-examine S.W. before the testimony was read to the jury, he or the Commonwealth could recall her to the stand afterwards. Id. at 83. The Commonwealth represented that it would recall S.W. and offer her for cross. Id.

The trial court then advised the jury that a certified legal intern from the District Attorney's office was going to play the role of S.W. "at an earlier proceeding that was under oath and subject to cross examination and is being admitted for your consideration for the substantive truth of what was testified to at that time." Id. at 86.

S.W.'s preliminary hearing testimony was that Appellant touched her in a way that made her uncomfortable. N.T. Preliminary Hearing, 7/1/16, at 13-14. Specifically, S.W. indicated that, on the occasion that she sat on

Appellant's lap while watching Frozen, Appellant licked her ear and touched her backside under her clothes. Id. at 16-17. S.W. also stated that Appellant on more than one occasion put his tongue in her mouth when he kissed her. Id. at 19. She said that when Appellant kissed her, he would use his hands to touch her under her clothes on her vagina and her backside. Id. at 47-48. S.W. also recounted a time when Appellant used his mouth to touch her on her front side, under her clothes, on the part of the body used to pee. Id. at 20-21. Although Appellant cross-examined S.W. at the preliminary hearing, he was prohibited from questioning her credibility or motivations to fabricate the allegations, as the judge agreed with the Commonwealth's contention that "credibility is not at issue at a preliminary hearing." Id. at 27.

After the preliminary hearing testimony was read to the jury, a lunch recess was taken. S.W. was not recalled to the stand afterwards. N.T. Trial, 3/1-7/17, at 88. However, Appellant did not object to the Commonwealth's failure to recall her or request that he be given the opportunity to cross-examine her about the preliminary hearing testimony.

Following the testimony of a medical expert, the Commonwealth next called Jamie Mesar, who conducted the forensic interview of S.W. on March 23, 2016. The Commonwealth, through Ms. Mesar, offered as an exhibit a video recording of the interview. Id. at 110. Appellant objected on the same grounds raised to the preliminary hearing testimony. Id. at 107. The trial

court admitted the evidence over Appellant's objection, and the video was played to the jury. Id. at 110-11.

In the interview, S.W. indicated that Appellant did a "bad thing" to her. Forensic Interview, 3/23/16, at 8:32:45.[2] She stated that he kissed her, and when asked where he kissed her, S.W. pointed to her mouth, her cheek, and the right side of her chest. Id. at 8:33:10. She acknowledged telling her mother that Appellant "hurt" her, again designating the location of the hurt as her mouth, cheek, and chest, as well as "both privates." Id. at 8:37:05-8:37:30. S.W. detailed Appellant's putting his tongue in her mouth, on her chest, on the outside of her buttocks, and both in and outside of her vagina. Id. at 8:44:34-8:48:00. S.W. indicated that the abuse occurred in both Appellant's house and her own, in various rooms, began when she was in kindergarten, and ended when she was aged seven or eight. Id. at 8:48:50-8:52:10.

Appellant cross-examined Ms. Mesar following the jury's viewing of the interview. N.T. Trial, 3/1-7/17, at 111-18, 120-122. S.W. was not recalled as a witness to allow Appellant to question her about the statements she made to Ms. Mesar. Nor did Appellant object to his inability to conduct cross-examination of S.W. following the playing of the forensic interview to the jury.

_____

[2] A DVD recording of the interview is included in the certified record, but not a transcript of its contents. Our citations to the video point to the approximate time of the statements represented based upon the recording's time-stamp.

The Commonwealth's next witness was S.W.'s mother. She described the day when she had questioned S.W.'s brothers about inappropriate kissing that led to S.W. revealing her allegations of Appellant's abuse for the first time. Id. at 124-28. Before S.W.'s mother began recounting S.W.'s statements, Appellant objected to such evidence as hearsay. Id. at 128. The Commonwealth again invoked the justification of prior inconsistent statements, and the trial court again overruled Appellant's objection. Id. at 129. S.W.'s mother testified that S.W. had told her that Appellant stuck his tongue in S.W.'s mouth when they kissed, and that it happened "a lot." Id. at 130. The witness also indicated that S.W. described an incident in which Appellant reached under a blanket in which S.W. had wrapped herself to touch her thighs while he put his tongue in her mouth. Id. at 130.

Having examined the three groups of out-of-court statements Appellant challenges in this appeal, we begin our review of the applicable law. The general rule is that hearsay, an out-of-court statement offered for the truth of the matter asserted, is not admissible. Pa.R.E. 802. As shown above, the out-of-court statements contained in the preliminary hearing testimony, the forensic interview, and the testimony of S.W.'s mother were admitted as substantive evidence for their truth, and thus constituted hearsay.

However, there are many exceptions to the general rule against hearsay. The trial court determined that these statements were both inconsistent and consistent, and relied upon the decisions in Brady

(inconsistent statements) and Hunzer (consistent statements) in ruling them admissible. Upon examination of these decisions, and other decisions regarding the relevant rules of evidence, we conclude that the trial court's reasoning does not support admission of any of the statements at issue.

In Brady, our Supreme Court overruled prior decisions that provided that prior inconsistent statements of a non-party witness could not be used as substantive evidence of the truth of the matters asserted, but only for impeachment. Brady, supra at 67. Brady, which predated the adoption of our rules of evidence, is consistent with Pa.R.E. 803.1(1), which now governs the admissibility of prior inconsistent statements. Rule 803.1 provides, in relevant part, as follows.

> The following statements are not excluded by the rule against hearsay if the declarant testifies and is subject to cross-examination about the prior statement:
>
> (1) Prior Inconsistent Statement of Declarant-Witness. A prior statement by a declarant-witness that is inconsistent with the declarant-witness's testimony and:
>
> > (A) was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition;
> >
> > (B) is a writing signed and adopted by the declarant; or
> >
> > (C) is a verbatim contemporaneous electronic recording of an oral statement.

Pa.R.E. 803.1(1). A witness may be impeached with a prior inconsistent statement without revealing the statement or its contents to the witness at

the time. Pa.R.E. 613(a). However, more stringent requirements control admission of extrinsic evidence of such statements:

> (b) Extrinsic Evidence of a Witness's Prior Inconsistent Statement. Unless the interests of justice otherwise require, extrinsic evidence of a witness's prior inconsistent statement is admissible only if, during the examination of the witness,
>
> > (1) the statement, if written, is shown to, or if not written, its contents are disclosed to, the witness;
> >
> > (2) the witness is given an opportunity to explain or deny the making of the statement; and
> >
> > (3) an adverse party is given an opportunity to question the witness.

Pa.R.E. 613(b).

To the extent that S.W.'s statements to her mother are inconsistent with her trial testimony,[3] the requirements of neither Rule 803.1(1) nor Rule 613(b) were satisfied. The statements to her mother were not given under oath, in a writing adopted by S.W., or in a contemporaneous recording. Further, S.W. was not presented with the statements and given an opportunity to explain or deny making it.[4] As such, the Commonwealth's extrinsic

_____

[3] For example, S.W. testified at trial that Appellant's mouth was closed when he kissed her, while she told her mother that Appellant put his tongue in her mouth.

[4] Although Appellant also contends that he did not have the opportunity to cross-examine S.W. at trial about her out-of-court statements, as noted, Appellant did not object to the Commonwealth's failure to recall S.W. after any of the statements were admitted or himself request that she take the stand for such purposes. Therefore, we agree with the Commonwealth that

evidence of S.W.'s statements to her mother was not properly admitted under Rules 803.1(1) and 613(b). Cf. Commonwealth v. Charleston, 16 A.3d 505, 527 (Pa.Super. 2011), abrogated on other grounds, In re L.J., 79 A.3d 1073 (Pa. 2013) (holding extrinsic evidence of witness's out-of-court statements was properly admitted where the Commonwealth disclosed contents of statement to witness during examination and asked witness about making the statement, and the defense was given the opportunity to question the witness about it).

Nor were the inconsistent statements in S.W.'s forensic interview or preliminary hearing testimony properly admitted under these rules. The Commonwealth did not offer the statements during its examination of S.W., but only after S.W. left the witness stand without having presented their contents to her and giving her an opportunity to explain them. Cf. Brady, supra at 70-71 (detailing the Commonwealth's examination of the witness with her prior inconsistent statement and the witness's admission that she made the statement before a video recording of the statement was admitted as substantive evidence and played to the jury).

_____

Appellant did have the opportunity to cross-examine S.W. about the out-of-court statements, but neglected to exercise it. See Commonwealth's brief at 21 ("For whatever reason, [S.W.] was not recalled and defense counsel never mentioned the matter again.").

To the extent that the trial court admitted the three instances of S.W.'s out-of-court statements as prior consistent statements, Pa.R.E. 613(c) applies. That rule provides as follows.

> (c) Witness's Prior Consistent Statement to Rehabilitate. Evidence of a witness's prior consistent statement is admissible to rehabilitate the witness's credibility if the opposing party is given an opportunity to cross-examine the witness about the statement and the statement is offered to rebut an express or implied charge of:
>
> > (1) fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose; or
> >
> > (2) having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness's denial or explanation.

Pa.R.E. 613(c). "A prior consistent statement is always received for rehabilitation purposes only and not as substantive evidence." Commonwealth v. Busanet, 54 A.3d 35, 67 (Pa. 2012) (cleaned up).

The Commonwealth in its brief concedes that none of S.W.'s out-of-court statements at issue was properly admitted under Rule 613(c):[5]

> Regardless of whether any of the victim's statements could be construed as "consistent" with her previous testimony and interview statements, the record does not establish a charge of recent fabrication such that prior consistent statements were admissible. Nor did the victim make a prior "inconsistent" statement that she denied or explained. . . .

_____

[5] This Court applauds the Commonwealth's observance, on this issue and throughout its brief, of its duty under Rule 3.1 of the Rules of Professional Conduct not to controvert issues when doing so lacks a non-frivolous basis in law or fact.

Furthermore, this Court recently determined that the forensic interview of a victim may not be introduced as a prior consistent statement where there is no allegation of "recent fabrication" in Commonwealth v. Bond, [190 A.3d 664, 670 (Pa.Super. 2018), and] the victim's motive to lie arose "before she first complained of the assault." . . . In the instant case, there is no suggestion of falsification occurring after the forensic interview. Consequently, they would not be admissible as rebuttal.

Commonwealth's brief at 24.

We agree. For these reasons, the trial court's reliance upon Hunzer to support its decision to admit the statements as prior consistent statements is misplaced. See Hunzer, supra at 513 (holding prior consistent statements of child-victim were properly admitted under Rule 613(c) where "the Commonwealth utilized the victim's prior consistent statements to rebut an inference of recent fabrication" and the defendant had impeached the witness with prior inconsistent statements).

Our conclusion that the trial court's stated bases for admitting S.W.'s out-of-court statements were erroneous does not end our inquiry, as we may affirm a trial court decision on any basis apparent from the record. See, e.g., Commonwealth v. Fant, 146 A.3d 1254, 1265 n.13 (Pa. 2016) ("According to the 'right-for-any-reason' doctrine, appellate courts are not limited by the specific grounds raised by the parties or invoked by the court under review, but may affirm for any valid reason appearing as of record."). Therefore, we consider whether any other rules of evidence allow for the admission of S.W.'s hearsay statements.

Rule 803.1(3) provides an exception to the rule against hearsay, when a witness testifies at trial and is subject to cross-examination, for the recorded recollection of the witness. Specifically, a "memorandum or record made or adopted by a declarant witness" is admissible when it

> (A) is on a matter the declarant-witness once knew about but now cannot recall well enough to testify fully and accurately;
>
> (B) was made or adopted by the declarant-witness when the matter was fresh in his or her memory; and
>
> (C) the declarant-witness testifies accurately reflects his or her knowledge at the time when made.

Pa.R.E. 803.1(3). "If admitted, the memorandum or record may be read into evidence and received as an exhibit, but may be shown to the jury only in exceptional circumstances or when offered by an adverse party." Id.

Both the preliminary hearing testimony and forensic interview arguably qualify as a record of S.W.'s recollection.[6] See, e.g., Commonwealth v. Shelton, 170 A. 3d 549, 552 (Pa.Super. 2017) (holding video recording of a forensic interview constituted a recorded recollection for purposes of Pa.R.E. 803.1(3)). S.W. acknowledged at trial that she had given other statements about the incidents in question, testifying that she "started going to these different places" after she told her mother about Appellant's conduct and, at one of these places, told the forensic interviewer that Appellant touched her

_____

[6] This exception obviously is inapplicable to support the testimony of S.W.'s mother; it is not a memorandum or record.

in a certain way on her face, legs, and arms. N.T. Trial, 3/1-7/17, at 75. This, combined with S.W.'s indications at trial that she did not remember or did not know the answers to the Commonwealth's questions, suggest that S.W. once knew about the matters in question but could no longer recall well enough to testify about them. However, the record does not establish that the statements recorded at the preliminary hearing and the forensic interview were made at a time that the matter was fresh in S.W.'s memory. Nor did S.W. testify at trial that the preliminary hearing transcript and the forensic interview video accurately reflect her knowledge at the time they were made. Without such a foundation, Rule 803.1(3) is not a valid basis upon which to affirm the admission of the hearsay statements. Cf. Shelton, supra (affirming admission of forensic interview where the victim testified at trial that her memory was much better at the time the video was made).

Another hearsay exception potentially applicable to S.W.'s preliminary hearing testimony is found at Pa.R.E. 804(b)(1). That rule provides:

> The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
>
> (1) Former Testimony. Testimony that:
>
>> (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and
>>
>> (B) is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

Pa.R.E. 804(b). The rule provides criteria for determining whether a declarant is "unavailable," including when the declarant "testifies to not remembering the subject matter, except as provided in Rule 803.1(4)[.]"[7] Pa.R.E. 804(a).

While the Commonwealth contends that S.W. could be considered to have been unavailable at trial based upon her lack of memory, see Commonwealth's brief at 27, it concedes that the preliminary hearing testimony was not admissible under Rule 804(b)(1) because of "the limited scope of cross-examination" provided to Appellant at the preliminary hearing. See id. at 28 n.3. We agree that Rule 804(b)(1) does not validate the admission for that reason. See, e.g., N.T. Preliminary Hearing, 7/1/16, at 27 (sustaining Commonwealth's objection to Appellant's cross-examination of S.W. because "credibility is not at issue at a preliminary hearing").

Finally, we consider whether the hearsay evidence of S.W.'s statements at the preliminary hearing, in the forensic interview, and to her mother were properly admitted under the tender years hearsay exception codified at 42 Pa.C.S. § 5985.1. That statute provides as follows in relevant part.

_____

[7] "The purpose of [Rule 803.1(4)'s] hearsay exception is to protect against the 'turncoat witness' who once provided a statement, but now seeks to deprive the use of this evidence at trial." Pa.R.E. 803.1(4), Comment. It applies "when the declarant-witness feigns memory loss about the subject matter of the statement." Id. If the claim of memory loss is credible, Rule 803.1(3) (recorded recollection, discussed supra) applies instead. Id. There is no indication in the record that the trial court found that S.W. feigned her lack of recollection about the events such that this rule was applicable to protect against her being a turncoat witness. As such, Rule 803.1(4) does not support the admission of S.W.'s out-of-court statements.

(a) General rule.--An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing[, inter alia, the sexual offenses for which Appellant was tried,] not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:

(1) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2) the child either:

(i) testifies at the proceeding; or

(ii) is unavailable as a witness.

. . . .

(b) Notice required.--A statement otherwise admissible under subsection (a) shall not be received into evidence unless the proponent of the statement notifies the adverse party of the proponent's intention to offer the statement and the particulars of the statement sufficiently in advance of the proceeding at which the proponent intends to offer the statement into evidence to provide the adverse party with a fair opportunity to prepare to meet the statement.

42 Pa.C.S. § 5985.1.

"Relative to the notice requirement under this hearsay exception, the Commonwealth has the burden of providing actual notice of an intention to offer the hearsay statement." Commonwealth v. O'Drain, 829 A.2d 316, 320 (Pa.Super. 2003). However, "the notice need not contain an exact word-for-word recitation of that out-of-court statement. . . . Rather, the Act merely requires that the notice contain 'the particulars of the statement.'" Hunzer, supra at 511.

The Commonwealth acknowledges that no in camera hearing was held in which the trial court reviewed the proposed evidence and found it to have sufficient indicia of reliability, but argues that such was evident from the on-the-record discussion, and Appellant did not object to the lack of a hearing. Commonwealth's brief at 17. However, even assuming arguendo that subsection (a) of the statute was satisfied, there is no indication in the record that the Commonwealth gave Appellant notice of its intent to invoke the tender years exception in advance of trial. On the contrary, Appellant specifically objected at trial that "under Hunzer . . . it requires notice of the tender years exception, which we did not receive until right now." N.T. Trial, 3/1-7/17, at 81. The language of subsection (b) is clear: the statements "shall not be received into evidence" unless the notice requirement is satisfied. Accordingly, the tender years hearsay exception does not justify the trial court's decision to admit S.W.'s out-of-court statements for the truth of the matters asserted therein.

Having determined that the multiple instances of hearsay were admitted erroneously, we consider whether the trial court's errors were harmless. See, e.g., Commonwealth v. Allshouse, 36 A.3d 163, 182 (Pa. 2012) ("[T]he doctrine of harmless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt.").

As our reproduction of S.W.'s trial testimony supra indicates, the only properly-admitted inculpatory testimony offered by S.W. at trial was that Appellant touched her in a way she did not like with his hands and his lips; he asked her to sit on his lap; and he gave her long, closed-mouth kisses on the lips and cheeks, but not on any other parts of her body. Given the elements of the crimes of unlawful conduct with a minor,[8] endangering the welfare of children,[9] and corruption of minors,[10] we cannot conclude beyond a reasonable doubt that the improperly-admitted hearsay evidence did not contribute to the guilty verdicts.

Accordingly, it is clear that the trial court's errors in admitting preliminary hearing testimony, the forensic interview, and the hearsay

_____

[8] See 18 Pa.C.S. § 6318(a)(1) ("A person commits an offense if he is intentionally in contact with a minor, . . . for the purpose of engaging in an activity prohibited under any of the following . . . : (1) Any of the offenses enumerated in Chapter 31 (relating to sexual offenses).").

[9] See 18 Pa.C.S. § 4304(a)(1) ("A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.").

[10] See 18 Pa.C.S. § 6301(a)(1)(ii) ("Whoever, being of the age of 18 years and upwards, by any course of conduct in violation of Chapter 31 (relating to sexual offenses) corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of an offense under Chapter 31 commits a felony of the third degree.").

testimony of S.W.'s mother were not harmless.  See, e.g., Commonwealth v. LaRosa, 626 A.2d 103, 108 (Pa. 1993) ("Whenever there is a reasonable possibility that an error might have contributed to the conviction, the error is not harmless.") (cleaned up).  Therefore, we must vacate Appellant's judgment of sentence and remand this case for a new trial.  See id. (remanding for a new trial where, preliminary hearing testimony was erroneously admitted, where the Court could not conclude beyond a reasonable doubt that the fact-finder would have reached the same result absent the improperly-admitted evidence).

Judgment of sentence vacated.  Case remanded for new trial. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/27/2019