J-A11010-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                      :            PENNSYLVANIA
                                      :
             v.                        :
                                      :
                                      :
CHASE REED PELISSERO          :
                                      :
             Appellant          :     No. 809 WDA 2020

Appeal from the Judgment of Sentence Entered July 7, 2020
In the Court of Common Pleas of Washington County Criminal Division at
No(s):  CP-63-CR-0002689-2018

BEFORE:  McLAUGHLIN, J., KING, J., and McCAFFERY, J.

MEMORANDUM BY McLAUGHLIN, J.:            **FILED: AUGUST 13, 2021**

Chase Pelissero appeals from the judgment of sentence imposed following his convictions for Criminal Trespass, Terroristic Threats, Simple Assault, Defiant Trespass, and Harassment.[1] Pelissero claims that the court made improper evidentiary rulings and improperly failed to draw certain inferences from the evidence. We affirm.

Pelissero was charged with crimes against Brianna Seraly and Seraly's mother, Rose Walters, as well as Seraly's and Pelissero's daughter, B.S. ("Child"). Seraly and Child live with Walters. The charges arose from a series of incidents on three dates: March 16, April 20, and April 30, 2018. In the affidavit of probable cause, Police Officer Ryan Lenzi stated that Seraly had filed a private criminal complaint, which the District Attorney's Office denied

_____

[1] 18 Pa.C.S.A. 3503(a)(1), 2706, 2701, 3503(b)(1), and 2709, respectively.

but "turned over to police for criminal investigation." Affidavit of Probable Cause, filed Oct. 12, 2018, at 1. He then investigated the incidents, including speaking with Seraly and reviewing text messages and pictures sent to her by Pelissero, before charges were lodged. *Id.* at 1-2.

On the first day of Pelissero's bench trial, the Commonwealth asked for a continuance. It informed the court that Seraly had advised it the day before that there was a witness, Marcy Crowe, who could corroborate Seraly's testimony but who was not present in the courtroom. It explained that it had not subpoenaed her because it had not had time to do so. *See* N.T., 9/6/19, at 4. Seraly claimed that Crowe had witnessed the March 16 incident. *Id.* at 7. Pelissero objected that Seraly had "over a year to let [the prosecution] know about" her but had waited until the day before trial to do so. The Court denied the continuance. *Id.* at 8, 9.

Seraly then took the stand. The trial court summarized her testimony as follows:

> The first incident took place on March 16, 2018 at approximately 10 p.m. according to Ms. Seraly. Ms. Seraly testified that she was in her bedroom on the second floor with her daughter sleeping when pounding and kicking sounds awakened them. She opened her window to see [Pelissero] kicking and pounding on the front door and the windows by the front porch. Therefore, Ms. Seraly and [Child] went downstairs. While in the foyer, [Pelissero] broke into the home, causing a portion of the doorframe to break and fall next to [Child]. The Commonwealth introduced pictures documenting the broken doorframe. This commotion caused Ms. Walters, who was asleep downstairs, to awaken and warn [Pelissero] to leave the home. He did not comply with this request. Instead,

[Pelissero] grabbed Ms. Walters and threw her onto a couch. Ms. Walters responded by running outside to call for help. [Pelissero] then ran outside, threatened to kill Ms. Seraly, Ms. Walters, and [Child], jumped into his car, and sped away.

The second incident was on April 20, 2018. Ms. Seraly described that she was in her bedroom with [her daughter] and heard someone entering her home between 10 p.m. and 11 p.m.[1] This person, [Pelissero], walked up the staircase to the second floor and entered her bedroom. Ms. Seraly was on her cellular phone when [Pelissero] entered the bedroom, whom she described as being upset. [Pelissero] yelled at Ms. Seraly about the person that he believed she was speaking with on the phone. [Pelissero's] yelling caused [Child] to start crying, and she jumped into Ms. Seraly's arms. Ms. Seraly told [Pelissero] that he needed to leave. Instead, [Pelissero] grabbed Ms. Seraly and [Child] and started to throw them down the staircase. To save [Child], Ms. Seraly dropped [her], causing the child to smack her head against a door. After falling down the staircase, Ms. Seraly ran up the stairs to assist her crying daughter while [Pelissero] ran down the staircase and out of the house while yelling to [Child], "Your mom will be found hanging from a noose."[2] Ms. Seraly received a picture of a noose from [Pelissero] on her cell phone between the March 16th and April 20th incidents.

[1] The front door could not be locked because [Pelissero] had broken the doorframe on March 16, 2018. There was a screen door, but it had a flimsy lock. As [the landlord] testified, an adult could easily force open the screen door.

[2] Ms. Walters testified that she was sleeping on a couch on the first floor when awakened by two girls screaming upstairs. She testified that she only saw her daughter starting to run up the staircase and [Pelissero] running out of the house yelling, "You'll find your mother dead hanging from a noose."

The third incident Ms. Seraly described took place on April 30, 2018 at her home at approximately 11:30 p.m. when she was putting [Child] to bed. Ms. Seraly heard [Pelissero] enter her home again and come up the staircase to the

second floor.[3] With [Child] clinging to her, Ms. Seraly walked to the bedroom door and told [Pelissero] that he needed to leave. Disregarding the instruction, [Pelissero] said, "No," and started to spit on her and throw them around the bedroom. Ms. Seraly testified that she banged her head off the headboard of her bed and her dresser. This noise awakened Ms. Walters, who was asleep on the couch on the first floor, so she ran upstairs and yelled at [Pelissero] to leave her house. [Pelissero] than ran out of the house yelling, "You'll all be found dead in a pile of blood." Ms. Seraly suffered a gash on the right side of her forehead.

[3] Ms. Walters had yet to fix the front door frame.

Trial Court Opinion, filed Oct. 14, 2020, at 1-3 (internal citations omitted).

On cross-examination, Pelissero questioned Seraly about her delay in reporting the incidents and in seeking a protection from abuse ("PFA") order. N.T., 9/6/19, at 52-59. She conceded that she did not file a PFA petition or speak to the police until after Pelissero had filed a Complaint for Custody of Child. *Id.* at 65. She explained that she had been afraid and that when she got counsel, he took her to get a PFA order. *Id.* at 56, 58.

Pelissero then asked the court for permission to cross-examine Seraly about cards and letters Seraly had sent Pelissero on Child's behalf. He maintained they were relevant because "this belies and undercuts" her testimony that she was afraid, pointing out that Seraly sent them after an alleged incident in 2014 in which Pelissero ran her off the road. *Id.* at 79.[2] The Commonwealth argued Pelissero was inappropriately attempting to have the then five-year-old Child testify through exhibits. It also disputed the

_____

[2] Pelissero also attempted to admit one of the Father's Day cards during his own testimony. The court sustained an objection. N.T., 11/8/19, at 93-95.

relevance of the cards and letters. The court allowed the questioning. When Pelissero asked Seraly when she had sent the cards, she said she did not know precisely but that it was after the 2014 incident and before the incidents at issue. *Id.* at 81-82, 107.

Pelissero's counsel then sought permission to ask Seraly about Pelissero's mother's visits with Child, which the court found to be irrelevant:

> [PELISSERO'S COUNSEL]: Judge, before I launch into my next area, what I would like to ask this witness and what I would like to show is that her testimony about Chase's -- Chase being erratic and that's what -- there was a problem with visitation, it's our position that this woman also has been very possessive with respect to this child as far as Chase's grandmother – Chase's mother, excuse me, Stacey Pelissero. She was forced to file a petition to intervene. There was a full hearing, and I just want to explore this because, like I said, our position is that her motivation for all of this is to prevent Chase and, for that matter, his mother from having visitation, and that's the motive which is motivating these false accusations. Before I launch into this, I'm coming up here to give [the ADA] the opportunity. If he wishes to object, and I can show you the entire petition.
>
> . . .
>
> THE COURT: An intervention proceeding is not dependent on anything other than the mother and the father of the child not being together, and all of these alleged incidents really is defendant's behavior, has nothing to do with grandmother. So I would find that that is irrelevant.

*Id*. at 97-99.

Pelissero testified in his own defense. He admitted he went to the home on the occasions mentioned but did so to see his daughter. He denied intentionally hurting anyone. N.T., 11/8/19, at 65-87. He testified that in May

2018 he retained a lawyer and filed a Complaint for Custody of Child. *Id.* at 88. He said that before this, Seraly had continued to permit him to see Child and that he spent time with Seraly and Child. He said that once he sought custody, he was served with a petition for a PFA and Seraly no longer permitted him to see Child without court intervention. *Id.* at 95. The Criminal Complaint was served on him in November 2018.

Seraly's neighbor, Darla Balmer, also testified for the defense. She said that she often hears things from Walters' home and pays attention to that area because her grandchildren live near there. She testified that she did not see anyone run from the home or hear yelling or screaming at the time of the first incident. She likewise stated that on the afternoon of the second incident, although she saw Pelissero at Walters' home, she did not see or hear anything untoward. *Id.* at 32-34. However, she saw Pelissero return that evening, heard Seraly and Pelissero arguing, and heard Seraly tell Pelissero to leave. *Id.* Pelissero then left. *Id.* She did not hear Pelissero make any threats.

Pelissero then asked the Court for permission to question Balmer about an incident in which Seraly allegedly hit Pelissero in the face with a can of soda. Pelissero claims this testimony would "refute[] the representation that these people are somehow so chocked in fear of him that they would never go to the police." *Id.* at 21-23. The Commonwealth objected that Pelissero was attempting to attack Seraly's character with "so-called isolated incidences of alleged misconduct." *Id.* at 21. The court sustained the objection. *Id* at 22-23.

The trial court also barred Pelissero from asking Balmer about alleged threats she received from Seraly. *Id* at 76. The judge stated, "I don't think it's relevant. What is relevant is her testimony and her credibility . . . But this -- I don't think that this goes to bias. But, also, importantly, it's beyond what the scope of why this witness was being offered." *Id.*

Pelissero also called the investigating officer, Officer Lenzi, to testify. He stated that Seraly and Walters came to the police before filing a private criminal complaint, and he investigated. *Id.* at 7-8. He testified that Seraly and Walters did not tell him that Pelissero had filed a custody complaint. *Id.* at 9. Pelissero asked whether Officer Lenzi filed charges only after Seraly's civil counsel contacted the police department, and Officer Lenzi testified that he had acted on his own independent judgment and Seraly's counsel had no impact on his decision. *Id.* at 15, 16.

Pelissero's mother, Stacey Pelissero ("Stacey"), also testified on Pelissero's behalf. When Pelissero attempted to question Stacey about her knowledge of Pelissero's cognitive injuries, the court disallowed the testimony. *Id*. at 191, 192.

The trial court found Pelissero guilty of three counts each of Trespass, Terroristic Threats, and Defiant Trespass; five counts of Simple Assault; and one count of Harassment. The court sentenced him to an aggregate term of three to 12 months' imprisonment, 24 months' probation, and a $300 fine. Pelissero filed a post-sentence motion asking the trial court to delay his date to report to prison and to change the prison sentence to house arrest. The

court extended his report date by 30 days but denied the request for house arrest.

Pelissero filed a timely Notice of Appeal. Both the trial court and Pelissero have complied with Pa.R.A.P. 1925. Pelissero raises multiple issues:

> 1. Did the court err in failing to draw an unfavorable inference and give no weight to the fact that the arresting officer and assistant D.A. Ridge initially refused to approve criminal Charges and subsequently changed their mind after . . . the attorney for the alleged victim in all civil matters, contacted the authorities ex-parte to encourage them to file criminal charges?
>
> 2. Did [the trial court] err in preventing the defense from eliciting evidence from Darla Esper Balmer in which the alleged victim struck [Pelissero] with a can of soda contradicting the alleged victim's assertion that she was too terrified of [Pelissero] to contact the Monongahela Police?
>
> 3. Did the court err in barring the defense from presenting evidence that the alleged victim threatened the defense witness in an effort to attempt to intimidate her from testifying?
>
> 4. Did the court err in preventing the defense from showing that the alleged victim met [Pelissero] and gave him a Father's Day card from their child subsequent to the alleged criminal incidence?
>
> 5. Did the court err in failing to draw an unfavorable inference from the Commonwealth's failure to call Marcy Crowe, a purported witness for the Commonwealth?
>
> 6. Did the court err in failing to consider the alleged victim attempted to prevent father's mother from seeing her granddaughter as well as father?
>
> 7. Did the court err in limiting defense counsel's efforts to cross examine Officer Lenzi as to why he declined to initially file criminal charges?

8. Did the court err in preventing [Pelissero's] mother from testifying as to defendant's mental status and cognitive problems?

Pelissero's Br. at 7-8.

Pelissero's brief is deficient in that it does not offer any legal authorities at all to support his numerous arguments. They are thus conclusory and lack development. For some, he has also failed to identify the place in the record where he preserved the claim. His arguments are so undeveloped as to be waived. *See Commonwealth v. Sullivan*, 864 A.2d 1246, 1249 (Pa.Super. 2004) (finding claim waived where appellant did not cite relevant authority).

Moreover, they are plainly meritless.[3] He raises purported errors in evidentiary rulings. We review challenges to evidentiary rulings for abuse of discretion. *Commonwealth vs. Dillon*, 925 A.2d 131, 136 (Pa. 2007). Our scope of review is plenary. *Commonwealth vs. Corban Corp*., 909 A.2d 406, 410 (Pa.Super. 2006). A trial court abuses its discretion when a ruling reflects manifest unreasonableness, stems from partiality, prejudice, bias, or ill-will, or is so lacking in as to be clearly erroneous. *Commonwealth vs. Huggins*, 68 A.3d 962, 966 (Pa.Super. 2013).

Even if an evidentiary ruling was erroneous, reversal is not required if the error was harmless. *Commonwealth v. Stokes*, 78 A.3d 644, 654 (Pa.Super. 2013). An error in a criminal trial is harmless only if the appellate

---

[3] The trial court concluded that Pelissero waived all issues except those relating to sentencing because he failed to raise them pursuant to Pa.R.A.P. 302(a). However, as noted above, the trial court addressed objections dealing with the issues at trial. Pelissero therefore preserved his claims.

court is convinced beyond a reasonable doubt that there is no reasonable probability that the error contributed to the verdict. ***See Commonwealth v. Fulton***, 179 A.3d 475, 493 (Pa. 2018). An error may be harmless in any of three ways: "(1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence that was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." ***Id.*** (citation omitted).

In issues one and seven, Pelissero claims that Officer Lenzi's decision to file the criminal charges stemmed from pressure from Seraly's civil counsel, and that the court erred in limiting Pelissero's ability to cross-examine Officer Lenzi about this. Pelissero's Br. at 23. Officials' motivations for bringing charges are not relevant to the ultimate question of guilt, and the trial court did not limit Pelissero's cross-examination of the officer in this regard. Pelissero was permitted to question Officer Lenzi as to why he originally did not press charges but subsequently did. In fact, the officer testified that Seraly's civil counsel did not contact the police department and no testimony suggests otherwise.

Pelissero's additional claim that the court should have made an adverse inference from the testimony also lacks merit. We are aware of no authority requiring any such inference. Pelissero was nonetheless free to make the

argument, the court, as factfinder, was likewise free to credit the testimony as it saw fit. ***See Commonwealth v. Gomez***, 224 A.3d 1095, 1099 (Pa.Super. 2019) (stating factfinder may "believe all, part, or none of the evidence").

In issues two and three Pelissero argues that the trial court should have permitted him to introduce testimony from Balmer that Seraly struck Pelissero with a can of soda and evidence that she threatened Balmer. Pelissero's Brief at 16, 17. The trial court found the evidence inadmissible as specific instances of bad acts offered to show a character. This was not an abuse of discretion. ***See*** Pa.R.E. 404(b). Furthermore, any error in this regard was harmless, as we are convinced that the evidence would not have changed the outcome of trial. ***See Fulton***, 179 A.3d at 493.

In his fourth issue, Pelissero argues that the court prevented him from "introducing evidence of a Father's Day card which was delivered to him at his home by Seraly with their child around Father's Day." Pelissero's Br. at 19. He claims the evidence contradicts the Commonwealth's statement that the alleged victim was too scared to go to the police. ***Id.***

This argument is contrary to the record. The court permitted Pelissero to question Seraly regarding the Father's Day cards. To the extent the testimony was limited in any way, the court did not abuse its discretion, as Seraly did not recall much information regarding the cards, including when the cards were sent, except that they were sent before the 2018 events.

Further, whether Seraly sent cards to Pelissero on Child's behalf before the incidents at issue would not have altered the outcome of the trial.

In his fifth issue, Pelissero insists he was entitled to an adverse inference for the Commonwealth's failure to call Crowe to testify. This issue lacks merit. A "missing witness" instruction is improper where the witness was equally available to both parties, or there was a satisfactory explanation for the witness's absence. **See Commonwealth v. Boyle**, 733 A.2d 633, 638 (Pa.Super. 1999). The Commonwealth was undisputedly unaware of Crowe's existence until the day before trial and therefore did not subpoena her. She did not appear voluntarily on the first day of trial, and although Pelissero claims she was in court on the second day, neither he nor anyone else placed anything on the record to memorialize her presence. Further, if Crowe was, in fact, in attendance on the second day of trial, Pelissero could have called her as his own witness. There was no abuse of discretion.

In his sixth issue, Pelissero argues that the trial court erred by preventing him from introducing evidence that parents embroiled in custody disputes use the criminal justice system to prevent the other parent from seeing the child. Pelissero's Br. at 22.

This also lacks merit. To begin, it is nowhere evident what "evidence" he refers to. His brief does not say and he did not make a proffer at trial. It appears he may be referring to transcripts from a preliminary hearing that he offered to show Seraly's motivation was to keep him from seeing Child and that her allegations were therefore false. N.T., 11/8/19, at 56. If this is the

evidence to which he refers, we are at a loss to understand the claim because the court agreed to take judicial notice of the contents of the materials. If he means some other evidence, we are equally at a loss because we are unaware of any other evidence offered for such purpose.

In his final issue, Pelissero argues that the court should have allowed his mother to testify about his alleged health problems, including attention deficit disorder and cognitive problems that stem from a car accident. He claims the testimony was relevant to show why he became frustrated. The court found the testimony irrelevant. We see no abuse of discretion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  8/13/2021